INFOSAGE, INC., Appellant

v.

**MELLON VENTURES, L.P., Mellon Ventures Inc. and Charles J. Billerbeck and Burton B. Goldstein, Jr., Appellees.**

Superior Court of Pennsylvania.

Argued Sept. 20, 2005.

Filed March 30, 2006.

---

Robert B. Sommer, Pittsburgh, for appellant.

Samuel W. Braver, Pittsburgh, for appellees.

BEFORE: ORIE MELVIN, McCAFFERY, and POPOVICH, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, InfoSAGE, Inc., a Pennsylvania corporation, appeals from the order of the Honorable R. Stanton Wettick, Jr., entered October 19, 2004, in the Court of Common Pleas of Allegheny County, granting summary judgment in favor of Appellees and dismissing in its entirety Appellant's amended complaint. Specifically, Appellant asks us to determine

whether genuine issues of material fact exist to support its counts sounding in tortious interference with prospective business relations, breach of fiduciary duty, and aiding and abetting a breach of fiduciary duty. Because we conclude that Appellant has failed to adduce sufficient evidence establishing necessary elements showing a tortious interference with prospective business relations and breach of fiduciary duty, we affirm.

¶ 2 The trial court's factual recitation, construing the evidence most favorably to Appellant, is as follows:

[Appellant] was a software development company. The development of its products and services was financed by an initial round of founder financing of approximately $5 million and two rounds of venture capital financing that provided another $5 million. [Appellee] Mellon Ventures, L.P. ("Mellon") provided the initial round of the venture capital financing. Mellon, [Draper] Triangle Partners, and Russell, Rea, Zappalla ["RRZ"] provided the second round of venture capital financing.

In the spring of 2001, [Appellant] had a five-member board of directors. The members were Anthony J. Bonidy (President and CEO—.9% owner), Robert Capretto (Chairman of the Board and 26.5% owner), Robert L. Reed (22.1% owner), Donald H. Jones, and [Appellee] Charles J. Billerbeck. [Draper] was a 7.9% owner of [Appellant]; Donald Jones was a member of [Appellant's] board of directors as a result of [Draper's] investment. Mellon was a 20.4% owner of [Appellant]; [Appellee] Charles J. Billerbeck, a director of Mellon, was a member of [Appellant's] board of directors as a result of Mellon's investment.

Evidence favorable to [Appellant] will support a finding that by early 2001, [Appellant] had completed the development and testing phase for its software product. In late 2000, [Appellant's] board of directors approved a business plan predicated upon [Appellant's] securing a third round of financing that would be used for its marketing efforts. [Appellant] needed to promptly secure this financing because it would be running out of money by the summer of 2001. In January 2001, [Appellant] retained Ms. Elizabeth M. Audley, an investment banker with Morgan, Franklin & Co., to assist [Appellant] in its search for financing. A pre-money valuation of [Appellant] of $23 million was agreed to be appropriate by all members of the board of directors. [Appellant] was seeking an equity investment of $5 million.

As of June 2001, the financing had not materialized. The board of directors (other than Mr. Jones and Mr. Billerbeck) voted to enter into a bridge loan contract with Mellon and [Draper] in order that [Appellant] could continue doing business while attempting to obtain a third round of financing. The contract was executed on June 22, 2001.

[Appellant] was never able to obtain a third round of financing. It ceased doing business in October 2001 because it could not obtain additional financing. On January 31, 2002, it filed Chapter 11 proceedings in the United States Bankruptcy Court for the Western District of Pennsylvania.

Several weeks before [Appellant] entered into the bridge loan, [Appellant's] principals (Tony Bonidy and Robert Capretto) accused Mr. Billerbeck and Mellon of interfering with [Appellant's] efforts to obtain financing. They claimed that Mellon was taking steps to dissuade potential investors from participating in the third round of financing.

On August 16, 2001, [Appellant] filed this lawsuit against Mellon and Mr. Billerbeck, alleging that both ... had tortiously interfered with prospective business relations. The complaint also alleged that both ... had breached their fiduciary duties to [Appellant] by interfering with its financing efforts. The accusations against [Appellees] included their setting an unreasonably low valuation of [Appellant] and communicating the low valuation to venture capitalists and other third parties.

Subsequently, [Appellant] amended its complaint to add Mellon Ventures, Inc. ("MVI") and Burton B. Goldstein, Jr. as defendants, and to add a count for aiding and abetting the breach of a fiduciary duty. The Complaint identified MVI as the investment manager for Mellon[,] and Mr. Goldstein as an employee of MVI. [Appellant] claims that Mr. Goldstein and MVI assisted Mr. Billerbeck and Mellon in dissuading venture capital firms from providing financing to [Appellant] by directly contacting these firms and asking them to stay out of the financing efforts of Mellon.

[Appellant] contends that [Appellees] interfered with [Appellant's] efforts to obtain financing because [Appellees] wanted (i) to force [Appellant] to obtain the third round of financing from Mellon at terms which Mellon would dictate, (ii) to force [Appellant's] board of directors to sell [Appellant] prematurely and/or (iii) to trigger a liquidation preference that would wipe out the ownership interests of the initial investors.

[Appellant's] Complaint identifies the following third parties as potential third round investors that were dissuaded from investing in [Appellant] because of actions taken by [Appellees] that were intended to dissuade them from doing so: Pa. Early Stage, Pennsylvania Technology Investment Authority (PTIA), Liberty Ventures, Cross–Atlantic, Grotech, Gabriel Ventures, Rahn Group, Trinity Ventures, and Phoenician Ventures.

(Trial Court Opinion, dated October 5, 2004, at 1–5) (citations to the pleadings and footnotes omitted).

¶ 3 Following the close of the pleadings, the parties undertook extensive, indeed exhaustive discovery.[1] At the conclusion of discovery, Appellees filed their motion for summary judgment, contending that the evidence failed to show that they had in any manner interfered with Appellant's efforts to obtain third-round financing. The trial court agreed, and granted Appellees' motion for summary judgment.

¶ 4 In arriving at its decision, the court noted that affidavits and testimony given by principals and key witnesses from the nine (9) venture capital firms identified in the amended complaint uniformly revealed that these entities had declined to invest in Appellant for independent business reasons, and that these entities had not been deterred or dissuaded from investing in Appellant by Appellees or any act performed by Appellees. The court further noted that Appellant had adduced evidence indicating potential interference with only four (4) of these firms: Phoenician Ventures I, L.P. ("Phoenician"), Liberty Venture Partners ("Liberty"), PTIA, and Pa. Early Stage.[2] For purposes of its summary judgment review, the court properly rejected any evidence that denied interference by Appellees with these four entities

1. The certified record in this matter contains twenty-six (26) deposition transcripts alone.

2. Pa. Early Stage is also identified at times in the record as PA Early Stage and Pennsylvania Early Stage.

and examined only the evidence arguably supporting Appellant's allegations.

¶ 5 Concerning Phoenician, Appellant produced evidence that this firm was aware that Mellon had placed an "unreasonably low valuation" upon Appellant, that the firm was in agreement with this valuation, and that Phoenician understood that Mellon was doing a "down round"[3] for the third round of financing.[4] The court concluded, however, that this evidence failed to establish that (1) Mellon was the source of Phoenician's determination of a low valuation for Appellant and (2) Phoenician would have invested in Appellant but for the acts of Appellees.

¶ 6 With respect to Liberty, the court took note of the deposition testimony of Bonidy and Audley indicating that Liberty had showed interest in Appellant at an initial business meeting, after which a principal from Liberty stated that Liberty would "definitely ... be moving forward." (Audley Deposition, 2/19/02, at 407). The court then noted evidence showing that two weeks after the meeting, Liberty notified Appellant that it would not be pursuing the investment opportunity with Appellant. In the interim, Billerbeck had become aware that Liberty was interested in Appellant as an investment. Audley also testified that her research revealed that Liberty had co-invested in projects with Mellon and that Liberty "probably knew" Mellon. (Audley Deposition, 2/19/02, at 408). The court determined that this evidence, taken as a whole, could

not support a jury finding that it was more likely than not that Appellees had contacted Liberty to discourage it from investing in Appellant.

¶ 7 Concerning PTIA, the uncontradicted evidence of record established that PTIA had entertained only the *possibility* that it would supply the final twenty (20) percent of the financing which Appellant was seeking, provided that Appellant would first obtain eighty (80) percent of its financing needs from other sources. Therefore, the court concluded that, as Appellant had been unable to obtain third-round financing from any other entity, its failure to obtain financing from PTIA could not be attributable to Appellees.

¶ 8 The most extensive evidence adduced by the parties concerns Appellees' alleged interference with a possible business relationship between Appellant and Pa. Early Stage. The trial court examined this evidence at length, quoting large portions of relevant testimony in its opinion. We also quote this evidence at length in order to give a full frame of reference to the trial court's decision and the arguments now raised by Appellant in the present appeal.

¶ 9 Michael Bolton, the manager of Pa. Early Stage, and Jason Mahoney, a principal employee of the firm, testified by deposition that the decision not to invest in Appellant was based on independent business reasons; that Appellees did not at-

---

3. A "down round" of financing is described by Billerbeck as "a circumstance where a subsequent round of financing would be done at a pre-money valuation, lower than the post-money valuation of a prior round of financing." (Billerbeck Deposition, 11/27/01, at 10). Thus, if after one round of financing a company had a post-money valuation of $20 million, the next round of financing would be a "down round" if it had a "pre-money" valuation of less than $20 million. (*Id.*)

4. The evidence to which the trial court referred is found in the deposition of Audley, who testified that a representative from Phoenician left a voice mail stating that she understood that Mellon was doing a down round and that she agreed with Mellon's valuation. (Trial Court Opinion at 8; Audley Deposition, 12/18/01, at 184).

tempt to dissuade or deter Pa. Early Stage from investing in Appellant (in fact just the opposite); and that Appellees did not provide Pa. Early Stage with a value for Appellant. In fact, Pa. Early Stage independently came to believe that Appellant had placed too high a value upon itself. (Bolton Deposition, 12/21/01, at 8–12, 17–18, 23–25; Mahoney Deposition, 6/24/03, at 57–68, 71–77). The trial court did *not* consider this testimony for purposes of its summary judgment review.

¶ 10 The court first reviewed evidence that purported to demonstrate that Pa. Early Stage had declined to invest in Appellant because Appellee Goldstein had told Bolton, prior to May 30, 2001, that there was no present need for Pa. Early Stage to provide funding for Appellant, as Mellon would be providing financing by a bridge loan or some other form of financing.[5] This evidence came directly from the deposition testimony of Stephen Kohler, Director of the Pennsylvania Governor's Action Team. Capretto had contacted Kohler in April 2001 to solicit assistance for Appellant's efforts to obtain third-round financing. It was Kohler who contacted Bolton about the opportunity to invest in Appellant. Kohler testified that Bolton initially had seemed interested in the prospect. (Kohler Deposition, 12/17/01, at 32). By late May, however, Audley was having trouble getting in touch with Bolton, and Capretto asked Kohler to investigate. Kohler later called Capretto to report that he had had a telephone conversation with Bolton, which Kohler described in his deposition testimony as follows:

[Bolton] indicated to me that he had spoken with an individual by the name of Buck Goldstein, and that Buck was affiliated with Mellon, and that they … collectively, between [Bolton] and Buck, had determined that they had—he wasn't specific in how—he may have been specific in how he said it. I am not specific in how I recall it.

The conveyance [sic] was that there may not be a need for PA Early Stage's financing and that the issue had been taken care of. Or the financial need would be satisfied, either through a bridge instrument, bridge loan, or some other financial support.

… He conveyed a clear message that PA Early Stage, although interested, would not be necessary for the financial need at this time. I guess if I can boil it down succinctly, that would be the essence.

(*Id.* at 34–35).[6]

¶ 11 The trial court rejected the evidence that Goldstein had dissuaded Bolton from pursuing an investment in Appellant as inadmissible hearsay. The court observed that Kohler had not been a witness to any conversation between Goldstein and Bolton. Therefore, the court determined that Kohler's testimony could not establish that Goldstein had told Bolton that Appellant no longer needed financing from Pa. Early Stage in its third-round financing. In coming to this conclusion, the court rejected Appellant's argument that Kohler's testimony had been offered only to

**5.** The evidence reflects that Billerbeck had not discussed the possibility of a bridge loan with Bonidy and Capretto before May 30, 2001.

**6.** Bolton denied that Goldstein or anyone else had told or asked him to keep Pa. Early Stage out of Appellant's third-round of financing. In fact, Bolton testified that both Goldstein

and Billerbeck had contacted him to encourage an exploration of investing in Appellant. (Bolton Deposition at 8–12). Goldstein also testified by deposition, denying that he attempted to dissuade Pa. Early Stage from investing in Appellant during its attempts to secure third-round financing. (Goldstein Deposition, 2/28/02, at 178–79).

show Bolton's "state of mind" on the issue. The court flatly concluded that Appellant was offering Kohler's testimony to prove Appellant's essential argument: that Appellees had acted to dissuade investors from financing Appellant in its third round.

¶ 12 The court then noted additional evidence purportedly establishing that Appellees had interfered with Appellant's efforts to obtain third-round financing with respect to Pa. Early Stage. Bonidy and Capretto testified in their depositions that they had confronted Billerbeck on May 30, 2001, about the conversation that Capretto had had with Kohler, in which Kohler had relayed the contents of his conversation with Bolton about Goldstein and Mellon, as described above. The following excerpt from Bonidy's Deposition sets forth Bonidy's recollection of the May 30, 2001 meeting at the Duquesne Club in Pittsburgh: [7]

> So when Billerbeck showed up, he walked in, we all sat down, of course Billerbeck's thinking we were going to ask him how does he justify this [low] valuation that he has put on [Appellant]. And Bob [Capretto] started the conversation off, and said, 'Chuck ... we have received a call from a very high level person at the state'—he did not give him his name—'who told us that Buck Goldstein had called Bolton and told Pennsylvania Early Stage not to invest.' [Billerbeck] said, 'That's tortious interference, that is fodder for a lawsuit. That is not where we want to go.' He said, 'Nobody knows about this but the three of us in this room. And our objective here is to discuss it, get it out on the table ... I want to reach an agreement and get this behind us.' He said, 'Tony [Bonidy], tell me what else you have learned.' I ... told him everything....

And so at the end of that conversation ... we said, 'Look, we know what you have done, we have had direct communication on it, we know how it's done, our purpose in this meeting is to get it behind us.' Billerbeck sat in his chair ... kind of thought for a second, and he looked at us, and ... he said, 'I don't understand why you two guys are concerned about this. We—I have already told both of you that I am going to take care of you with options.' And I said, 'Chuck, it is not about me, it is not about Bob, we represent all of the shareholders, and unless you are prepared to take care of all of the shareholders, that isn't going to fly.'

And he thought for a second, and he came back and ... said, 'Look ... I didn't want to do this, but I will give you a bridge note if you will make the lawsuit go away.' And I am not paraphrasing, this is an exact quote. 'I will make the lawsuit go away—I will give you a bridge note if you will make the lawsuit go away.' And we said, 'That's fine. We need enough time to raise the money.' He said, 'I will give you an amount of money that will allow you four months to raise the money, and I will stay out of the way, and I will get proactive.' And we said, 'Great.' We all stood up, we shook hands, and Bob Capretto one more time went through that, 'Nobody knows this, nobody should know it, it is going to go no further, it is behind us, it is done, we will never bring it up again.'

We left the Duquesne Club ... and Billerbeck looked at me, and he said[,] again, exact words, 'Now that we're on the same team, are there any other VC's that are showing interest? I need to know, I will get involved and talk to them.' I said, 'Yes ... [Liberty Ven-

---

7. Billerbeck is sometimes referred to during this testimony as "Chuck."

**624**

tures] showed a lot of interest.' And he said, 'Fine ... I think we know people there ... I will help you.' I said, 'Great.' And then ... we all shook hands ... and parted ways.

(Bonidy Deposition, 2/6/02, at 282–85).

¶ 13 Capretto's version of the events of May 30, 2001 is slightly different.[8] His recollection of the meeting with Billerbeck is as follows:

I sat directly across from [Billerbeck] so that I could look into his eyes ... as I proceeded to tell him I thought we had a problem, and I said, 'This is what supposedly occurred,' and I took him through the conversation with Steve Kohler that he had with Mike Bolton and the Buck Goldstein conversation, and I saw the look in his face and he ... said, 'Well, look, I don't know who did what ... but let's, you know,' we talked about there being a possible litigation, that I have to go to [board member] Bob Reed. I did not want to bring Bob Reed into the mix. We need to do something to fix it.

He didn't say, 'Look, I don't know if that occurred,' he said 'but what do you need? Do you need a bridge loan?' He said, 'How much do you need?' I think he said, '500, 250, 500, how many months do you need? How much is that going to be?' I think [Bonidy] was the one who came up with the amount. He said, 'I think we need about 750 to go till the end of September,' I believe it was. And Chuck started taking notes down real quickly, and he said, 'Look ... let me talk to the our [sic] guys, I'll talk to RRZ and I'll talk to Draper, I will get back to you.'

We went out the front entrance of the Duquesne Club.... He said, 'Now, look, Tony, I have got to know, who all are

you talking to at these venture firms? You got to know everybody, who are they? Who are you talking to?' And that's when [Bonidy] said 'Liberty.' ... And I was concerned about him saying anybody else because I was not sure ... I had suspicion, but I was not sure of how deep the involvement was and what the circumstances, what was happening. All I knew is there was a possibility of interference and that I wanted it fixed and I didn't want there to be any litigation from shareholders or anybody else, I wanted the company to grow, period.

(Capretto Deposition, 12/19/01, at 139–40).

¶ 14 In addition to this evidence, the court took note of the initial terms of the bridge loan that Mellon had offered Appellant as a result of the meeting among Billerbeck, Bonidy, and Capretto. These terms included a 150% warrant coverage, a 30% discount on the next round of financing, and built-in interest rates. Bonidy calculated the terms as giving Mellon a return of 650% annualized interest, terms that were both extraordinary and likely to dissuade any other entity from investing in Appellant. (Bonidy Deposition, 2/6/02, at 295–98).

¶ 15 The trial court determined, however, that this evidence was insufficient to support a finding that Appellees had dissuaded Pa. Early Stage or other potential investors from offering financing to Appellant. The court noted that this evidence does not contain Billerbeck's admission to any wrongdoing. The court further observed that Billerbeck's statements, as recounted by Bonidy, that he did not want a lawsuit, that he would secure a bridge loan to make the lawsuit go away, and that he would get proactive now that he was on the same team, do "not support a finding that Mr. Goldstein interfered with the Pa.

8. Billerbeck's version of these events is, as one might assume, very different.

Early Stage funding request. This is particularly true since, according to Mr. Bonidy's testimony, the next thing that happened was receipt of an e-mail from Mr. Billerbeck with terms of a bridge loan that was [sic] so onerous that it would not be accepted." (Trial Court Opinion at 31).

¶ 16 Having determined that Appellants failed to contradict with competent or sufficient evidence the showing by Appellees that they had not engaged in a tortious interference with Appellant's efforts to obtain third-round financing, the trial court granted Appellees' summary judgment motion and dismissed Appellant's amended complaint in its entirety.[9] Appellant filed the present appeal, in which it raises the following four issues for our review:

A. Whether a trial court may properly grant summary judgment against a plaintiff who produces sufficient evidence of facts to make out a *prima facie* cause of action as to each count in its complaint.

B. Whether a trial court may properly grant summary judgment against a plaintiff where the court has not given [the] plaintiff the benefit of construing the evidence of record in the light most favorable to it, nor granted [the] plaintiff the full benefit of all reasonable inferences from such evidence.

C. Whether a trial court may properly grant summary judgment against a plaintiff where the court has incorrectly excluded from its consideration, as inadmissible hearsay, probative testimony offered by the plaintiff.

D. Whether a trial court may properly dismiss a plaintiff's complaint in its entirety where the court has failed to con-

sider the evidence of record as it relates to two of the three counts.

(Appellant's Brief at 2).

¶ 17 When reviewing the propriety of an order granting summary judgment,

this Court must determine whether the record (1) establishes that the material facts are undisputed, or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the jury. Summary judgment should be entered only in those cases in which it is clear and free from doubt that the moving party is entitled to judgment as a matter of law. Where there is evidence that would allow a jury to find in the non-moving party's favor, summary judgment should be denied and the case should proceed to trial. Our scope of review is plenary, and we apply the same standard of review as the trial court.

*Lackner v. Glosser,* 892 A.2d 21 (2006) (quotation and citations omitted).

¶ 18 When a motion for summary judgment is based on insufficient evidence to support the factual basis for the cause of action or defense, the non-moving party must come forward with *sufficient* evidence essential to preserve the cause of action. *McCarthy v. Dan Lepore & Sons Co., Inc.,* 724 A.2d 938, 940 (Pa.Super.1998). The evidence adduced by the non-moving party must be of such a quality that a jury could return a favorable verdict to the non-moving party on the issue or issues challenged by a summary judgment request. *Id.* As our Supreme Court has observed:

Allowing non-moving parties to avoid summary judgment where they have no evidence to support an issue on which

---

9. The trial court opinion did not address Appellant's counts in breach of fiduciary duty or

aiding and abetting a breach of fiduciary duty.

they bear the burden of proof runs contrary to the spirit of [Pennsylvania Rules of Civil Procedure 1035.1–.5]. We have stated that the 'mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial.' We have a summary judgment rule in this Commonwealth in order to dispense with a trial of a case (or, in some matters, issues in a case) where the party lacks the beginnings of evidence to establish or contest a material issue.... Forcing parties to go to trial on a meritless claim under the guise of effectuating the summary judgment rule is a perversion of that rule.

\* \* \* \* \* \*

■ Thus, we hold that a non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor.

*Ertel v. Patriot–News Co.*, 544 Pa. 93, 100–02, 674 A.2d 1038, 1042 (1996).

■ ¶ 19 We are also mindful that the evidence relied upon by the non-moving party need not be direct evidence, but may be circumstantial evidence and the inferences reasonably deducible therefrom. *Cade v. McDanel*, 451 Pa.Super. 368, 679 A.2d 1266, 1271 (1996). Nevertheless, such circumstantial evidence and its reasonable inferences "must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith." *Id.* (quotation and citation omitted). It is also well-settled that a court reviewing the propriety of a summary judgment motion must be mindful that a jury may not be permitted to reach its verdict on the basis of speculation or conjecture. *Id.* With these standards in mind, we review Appellant's arguments.

## I. Interference with Prospective Business Relations

¶ 20 Appellant's first three arguments concern the question of whether Appellant had adduced sufficient evidence to contradict or challenge the array of evidence brought forth by Appellees showing that Appellees had not tortiously interfered with Appellant's prospective business relations. Appellant first contends that Billerbeck's statements and actions made at the May 30, 2001 Duquesne Club meeting, as recalled by Bonidy in his deposition testimony, are tantamount to an admission that he and the other Appellees tortiously interfered with Appellant's attempts to obtain financing from a number of venture capital firms, notably Pa. Early Stage. Appellant further contends that the trial court erred by striking as inadmissible hearsay Kohler's testimony that Goldstein informed Pa. Early Stage that Mellon would take care of Appellant's present financing needs, obviating the need, then, for Pa. Early Stage to invest. Appellant argues that this evidence should survive a hearsay challenge because it was offered only to show Pa. Early Stage's "state of mind" regarding its decision to decline investing in Appellant.

¶ 21 Appellant also contends that the trial court, instead of separately and hermetically examining the evidence as to each potential investor, should have viewed the evidence as a whole and provided Appellant with all reasonable inferences arising from that evidence. Appellant argues that had the court done so, it would have detected a pattern revealing (1) an initial interest by numerous venture capital firms in Appellant's prospects; (2) the strength of Appellant's prospects as evidenced by a possible partnership between Appellant

and an IBM business program; (3) a sudden and uniform demonstration of a lack of interest by the venture capital firms; (4) coincidentally with the latter, Billerbeck's devising an "unreasonably low" valuation for Appellant, one that was many millions below that devised by Appellant's board of directors; (5) knowledge of Mellon's valuation by at least one venture capital firm (Phoenician); (6) evidence that Goldstein had contacted Bolton; (7) Goldstein purportedly asking Bolton to keep Pa. Early Stage out of Appellant's third-round of financing; (8) Billerbeck's acknowledgement that Goldstein's alleged action was "fodder for a lawsuit"; (9) Billerbeck's failure to deny any wrongdoing at the Duquesne Club meeting; (10) Billerbeck's offer of a bridge loan "to make the lawsuit go away"; (11) Billerbeck's statement that he would now be on the same team, would get out of the way, and would be proactive; (12) Billerbeck discovering that Liberty was the only firm then interested in investing in Appellant; (13) Liberty's sudden decision not to invest in Appellant approximately one week after Billerbeck had learned of Liberty's interest; and (14) Mellon's offer of a bridge loan with terms so onerous that other venture capital firms would decline any investment with the borrower. Appellant also argues that most, if not all, of the evidence relied upon by Appellees in support of their summary judgment motion involves witness *testimony,* and thus a jury, not a court reviewing a summary judgment motion, must determine the credibility of this oral evidence, pursuant to *Nanty–Glo v. American Surety Co.,* 309 Pa. 236, 163 A. 523 (1932). *See Gutteridge v. A.P. Green Services, Inc.,* 804 A.2d 643, 652 (Pa.Super.2002) (observing that credibility of evidence is not a proper consideration at the summary judgment stage because the trial court may not summarily enter judgment when the evidence depends on oral testimony).

### (a) Elements of the Tort

¶ 22 In order for Appellant to prove the tort of interference with prospective business relations, it must establish the following:

(1) a prospective contractual relation;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damages resulting from the defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 208, 412 A.2d 466, 471 (1979) (footnote and citation omitted). Regarding the first element of this tort, *i.e.,* whether the evidence establishes a prospective contractual relation, our Supreme Court observed:

Defining a 'prospective contractual relation' is admittedly problematic. To a certain extent, the term has an evasive quality, excluding precise definition. It is something less than a contractual right, something more than a mere hope. Nevertheless, a working definition of the term is provided by *Glenn v. Point Park College,* [441 Pa. 474, 480–81, 272 A.2d 895, 898–99 (1971) ], wherein it was stated that:

... anything that is prospective in nature is necessarily uncertain. We are not dealing with certainties, but with *reasonable likelihood or probability.* This must be something more than a mere hope or the innate optimism of the salesman. As the Superior Court of New Jersey has put it, '... the rule to be applied ... is that the broker may recover when the jury is satisfied that but for the wrongful acts of the defendant it is *reasonably probable* that the plaintiff would have

effected the sale of the property and received a commission.' ... This is *an objective standard* which of course *must be supplied by adequate proof.*

*Id.* (citation omitted) (bold emphasis added).

¶ 23 In *Thompson Coal,* the Court determined that even though the plaintiff had a year-to-year lease of land from which it extracted coal, the plaintiff had no reasonable basis to expect a continuation of the leasehold or a possible acquisition of the land. The year-to-year lease had commenced on May 15, 1965, and the parties to the lease had agreed to an extension to March 1, 1975. The Court determined that the fact that said parties had agreed to extend the lease to a date certain objectively removed the reasonable probability that the lease would be continued. *Id.* at 209–10, 412 A.2d at 471–72.

¶ 24 In *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.,* 401 F.3d 123, 140–41 (3d Cir.2005), the federal appeals court, applying *Thompson Coal,* determined that it was not reasonably probable that a contractor would be awarded a bid, even though the contractor had previously convinced the project architect, who was to award all bids, to specify in its plans the particular and specific component manufactured by the contractor. Although the contractor's competitor had convinced the architect to change the project specifications after showing the architect a video that purportedly proved that the contractor's product could be a fire hazard, the court determined that this fact was insufficient to establish the first element of the tort of interference with prospective business relations. The court surmised that at most, the evidence showed that the contractor had been deprived of the opportunity to bid on the project as a result of its competitor's action. The court

noted that had the contractor remained in the bidding, there was no guarantee that it would have been awarded the contract, as there were two other potential suppliers of the same (discredited) product, either one of which might have been awarded the contract.

■ ¶ 25 In the case *sub judice,* our comprehensive review of the evidence as a whole, giving Appellant all reasonable inferences from the evidence as we must, and particularly in view of the guidance provided by *Thompson Coal* and *Santana Products,* establishes that Appellant *cannot* show that it had a *reasonable probability* of entering into a contractual relationship with the venture capital firms identified in the lawsuit. First, it is undisputed that Appellant had no contractual relationship with any of the potential investors for its third-round of financing, nor was any such contract in negotiation. Second, Appellant was unable to present evidence sufficient to challenge the broad array of evidence which Appellees adduced in support of their motion for summary judgment. All evidence in this case, in the form of testimony and affidavits, clearly showed that Appellant's efforts to obtain third-round financing had failed to advance to a point where a reasonable probability of a contractual relation was realistic.

### (b) Evidence Regarding Six of the Venture Capital Firms

¶ 26 Between January 12 and May 30, 2001, Audley contacted between thirty and thirty-five venture capital firms. (Audley Deposition, 12/18/01, at 86). With respect to the ones identified in Appellant's amended complaint as declining to invest in Appellant because of Appellees' alleged interference, Appellees noted the following evidence in support of their summary judgment · motion: Appellant's President

and CEO, Bonidy, testified with respect to Cross Atlantic Capital Partners that (1) he was unaware of any term sheet coming to Appellant from Cross Atlantic; (2) he was not aware if Audley had ever contacted Cross Atlantic; (3) he did not know if Cross Atlantic was in the market looking for investments when Appellant was seeking its third-round financing; (4) he recalled having unspecified conversations *about* Cross Atlantic, but did not recall much else; (5) as he recalled, Appellant *may have* fit the profile of companies in which Cross Atlantic invests; and (6) he was not aware of any facts that suggested that Cross Atlantic's lack of interest had anything to do with any of the Appellees. (Bonidy Deposition, 11/29/01, at 168–69). Glenn T. Rieger, founder, President, and Managing Director of Cross Atlantic, swore by affidavit that (1) Cross Atlantic had been contacted by Audley for a potential third-round investment opportunity; (2) Cross Atlantic had declined to invest because it had made a *prior* business decision "to focus reinvesting of its available funds in its own financings"; and (3) Cross Atlantic had in no way been dissuaded or deterred from investing in Appellant by any of the Appellees, nor was Cross Atlantic aware of any valuation which had been placed upon Appellant by Appellees. (Affidavit of Glenn T. Rieger, 2/21/03, at 2).

¶ 27 With respect to Gabriel Venture Partners ("Gabriel"), Bonidy testified that he did not "remember the specifics" of why Gabriel was mentioned in the amended complaint as a company declining to invest because of Appellees' alleged interference. Bonidy testified that he and Audley had discussed Gabriel, but with respect to Appellant's allegations, "it may be one [sic] she had seen something, I did not see it." (Bonidy Deposition, 11/29/01, at 175). Audley testified that she had contacted Gabriel on *Billerbeck's recommendation,* but that she never had a meeting with this company. (Audley Deposition, 12/18/01, at 163). Michael Wolf, an associate with Gabriel, swore by affidavit that (1) he learned of the opportunity for Gabriel to consider an investment in Appellant upon Mellon's recommendation; (2) after review of Appellant's business plan, Gabriel declined to invest in Appellant; (3) at no time did Gabriel receive any negative comments about Appellant from Appellees; and (4) on the contrary, Gabriel assumed that Mellon was supportive of the investment opportunity as Mellon had referred the opportunity. (Affidavit of Michael Wolf, 8/19/02, at 1).

¶ 28 With respect to Grotech Capital Group ("Grotech"), Bonidy testified, as he had done concerning Gabriel, that "he could not recall any specifics." (Bonidy Deposition, 11/29/01, at 176). He testified that he "may have had a conference call with Grotech," but he could not recall when this may have occurred, or any of the specifics of the call. (*Id.*) Bonidy further testified that Appellant had never received a term sheet from Grotech, nor did he supply Grotech with any follow-up information about Appellant's business. Further, Bonidy testified that he was unaware of any activity by Appellees that would have caused Grotech to decline investing with Appellant. (*Id.* at 177). Patrick J. Kerins, a partner with Grotech, swore by affidavit that (1) he was the principal of Grotech who had examined Appellant as a possible investment opportunity; (2) Grotech had declined to invest in Appellant because Grotech was not pursuing early-stage technology deals at the time; (3) Appellant was one of many deals involving early-stage technology that Grotech had declined to pursue in 2001; and (4) Grotech had not been dissuaded or deterred from investing in Appellant by any Appellee. (Affidavit of Patrick J. Kerins, 8/12/02, at 1–2).

¶ 29 With respect to Trinity Ventures VIII, LLC, Bonidy testified that so far as he knew, this company had not "indicate[d] any interest" in investing in Appellant. (Bonidy Deposition, 2/6/02, at 267). Fred Wang, General Partner of Trinity Ventures, swore by affidavit that (1) Trinity Ventures had been contacted by Audley regarding a possible investment in Appellant; (2) Billerbeck, an individual whom Wang "was familiar with," had encouraged Wang to seriously consider investing in Appellant; (3) Trinity Ventures had declined to invest in Appellant because of Appellant's (a) revenue history,[10] (b) east coast location,[11] and (c) market segment or "space" in the software market; and (4) Trinity Ventures had not been dissuaded or deterred from investing in Appellant by any Appellee. (Affidavit of Fred Wang, 6/7/02, at 2).

¶ 30 With respect to the Rahn Group, LLC, Audley testified that no negotiations concerning a possible contract with Appellant had occurred and that she was unaware of any correlation between the Rahn Group's decision not to invest in Appellant and any act that may have been committed by Appellees. (Audley Deposition, 12/18/01, at 178). Blake Nixon, an associate with the Rahn Group, swore by affidavit that (1) the Rahn Group had been contacted by Audley regarding a possible investment in Appellant; (2) the Rahn Group had declined to invest in Appellant based on information provided by Appellant and on Rahn's investment strategy at the time; and (3) the Rahn Group had not been dissuaded or deterred from investing in Appellant by any Appellee. (Affidavit of Blake Nixon, 6/17/02, at 1–2).

¶ 31 With respect to Phoenician Ventures, Bonidy testified that Audley had contacted this firm and had had a lengthy conversation about Appellant with one of the firm's representatives. Bonidy was unaware, however, if Phoenician had been in a position to invest in Appellant or if Appellant was the kind of company in which Phoenician typically would invest. (Bonidy Deposition, 11/29/01, at 145, 147). Ronen Herzig, former Vice President of Phoenician, swore by affidavit that (1) Phoenician had been contacted by Audley regarding a possible investment in Appellant; (2) Phoenician had decided not to invest in Appellant based on information regarding Appellant supplied by Audley; and (3) Phoenician had not been dissuaded or deterred from investing in Appellant by any Appellee. (Affidavit of Ronen Herzig, 6/25/02, at 2).

¶ 32 In response to all of the evidence submitted by Appellees regarding the above six venture capital firms, Appellant submitted *nothing* that would show that it had a reasonable probability of entering into a contract with any of them. At best, Appellant's argument amounts to no more than asserting that a reasonable probability of contracting with these firms existed because of Appellant's "attractiveness" as an investment. (*See, e.g.*, Appellant's Brief at 3–4). This argument, however, amounts to the equivalent, perhaps less, of the "mere hope or the innate optimism of the salesman." *Thompson Coal, supra* at 209, 412 A.2d at 471. Appellant also contends that a "chilling effect" had been cast over investment decisions by the venture capital community because of Mellon's "unreasonably low valuation" of Appellant. (Appellant's Brief at 15). Appellant, however, failed to provide any evidence of this. At most, Appellant provided evidence that

10. Appellant had no history of revenues. (Bonidy Deposition, 11/29/01, at 91).

11. Trinity Ventures maintains a principal place of business in California. (Affidavit of Fred Wang, 6/7/02, at 1).

Phoenician was aware of Mellon's valuation of Appellant. However, this evidence alone cannot establish that Mellon's valuation froze a prospective business relationship that, in reasonable probability, was on the road to contract. With respect to the business relationship between Phoenician and Appellant, the evidence shows only that Audley had a lengthy telephone conversation with Phoenician about Appellant. We can not conclude, under *Thompson Coal,* that a jury could make a finding from this evidence that Appellant had a reasonable probability of entering into a contract with Phoenician.

■ ¶ 33 We are mindful that as a general rule, a party moving for summary judgment may not rely exclusively on oral testimony in the form of affidavits or deposition testimony. *Bowe v. Allied Signal, Inc.,* 806 A.2d 435, 440 (Pa.Super.2002). Where, however, the moving party supports its motion for summary judgment by using *the admissions of the opposing party or the opposing party's own witnesses,* entry of summary judgment may be based on oral testimony alone. *Lineberger v. Wyeth f/k/a American Home Products Corporation,* 894 A.2d 141 (2006); *Bowe, supra.* As deducible from the above summary of evidence, the lack of evidence concerning the reasonable probability that Cross Atlantic, Gabriel, Grotech, Trinity Ventures, the Rahn Group, and/or Phoenician were likely to contract to invest in Appellant comes directly from the testimony of two of **Appellant's** principal witnesses, Bonidy and Audley. These witnesses essentially admitted that the finance-seeking process with the six venture capital firms had not advanced very far. Thus, Appellees' evidence **is** sufficient to support summary judgment with respect to any issue of tortious interference in a business relationship with Cross Atlantic, Gabriel, Grotech, Trinity Ventures, the Rahn, and Phoenician.

¶ 34 With respect to the remaining three venture capital firms (Liberty, Pa. Early Stage, and PTIA), Appellant offers a bit more evidence of a potential business relationship forming with these companies. Indeed, Appellant's arguments regarding Appellees' alleged interference in prospective business relations principally, if not exclusively, concerns these three companies. Upon review, however, we must conclude that the evidence is too insubstantial to establish a reasonable likelihood or probability of contract between Appellant and Liberty, Pa. Early Stage, or PTIA.

### (c) Liberty

¶ 35 In support of its summary judgment motion, Appellees submitted the affidavit of Karen Griffith Gryga, a co-founder and principal of Liberty. Gryga swore in this affidavit that (1) Liberty had been contacted by Audley regarding a possible investment in Appellant; (2) Liberty had decided not to invest in Appellant "for its own business reasons"; (3) Liberty had not been dissuaded or deterred from investing in Appellant by any Appellee; and (4) Liberty was unaware of any valuation placed upon Appellant by Appellees. (Affidavit of Karen Griffith Gryga, 5/9/03, at 2).

¶ 36 No testimony regarding a potential business relationship between Appellant and Liberty contradicts Gryga's assertions. Audley testified that Bonidy had met with representatives from Liberty, and that Audley had followed up with a telephone call to Gryga, who "had a very positive response," stating to Audley that "the meeting went really well." Audley also testified that Gryga had told her: "We definitely will be moving forward." (Audley Deposition, 2/19/02, at 407). Approximately one week after Billerbeck

learned that Liberty had an interest in Appellant, Audley received a voice mail message from Gryga stating that Liberty would not be pursuing the opportunity with Appellant. (*Id.* at 408).

¶ 37 Bonidy testified that he had "a suspicion" that Liberty had been dissuaded by Appellees from pursuing an opportunity to invest with Appellant. (Bonidy Deposition, 2/6/02, at 405, 409). Bonidy also testified, however, that Liberty had not committed to investing in Appellant, indeed "that they had [not] committed to anything" with Appellant. (*Id.* at 406). Bonidy explained that he believed that Liberty was "very enthusiastic" about Appellant based on his single one-on-one meeting with Gryga. He further explained that Gryga had told him at this meeting: "You [Appellant] are a little bit too early stage for our type of funds. However, I feel like this is a company we should make an exception on.... I'm intrigued by your relationship with IBM, I am intrigued by the space you are in, I am impressed by the job that's been done there, and this is a situation I think we would be interested in talking more about." (*Id.*)

¶ 38 Viewing Appellant's evidence in the light most favorable to Appellant and giving Appellant all reasonable inferences from the evidence, we cannot conclude that the evidence establishes that it was "reasonably *probable*" that Liberty would have invested in Appellant. At most, the evidence shows that Liberty was interested in "talking more about" the investment opportunity or "moving forward" in explo-

ration of this goal. There is no evidence of negotiation, of due diligence action, or of any other significant event in the finance-seeking process, other than an initial positive meeting and Audley's follow-up telephone call. Thus, Appellant's position with respect to Liberty as a prospect for future investment funds is, again, at the equivalent stage of the "mere hope or the innate optimism of the salesman." The evidence fails to establish that it was reasonably probable that Appellant and Liberty would have entered into a contract.[12]

### (d) Pa. Early Stage

¶ 39 With respect to Pa. Early Stage, Appellees relied upon the deposition testimony of Bolton and Mahoney, who, as we stated earlier in this opinion, testified that (1) the decision not to invest in Appellant was based on independent business reasons; (2) Appellees did not attempt to dissuade or deter Pa. Early Stage from investing in Appellant (in fact just the opposite); and (3) Appellees did not provide Pa. Early Stage with a value for Appellant; in fact, Pa. Early Stage independently came to believe that Appellant had placed too high a value upon itself. (Bolton Deposition at 8–12, 17–18, 23–25; Mahoney Deposition at 57–68, 71–77).

¶ 40 More specifically, the deposition testimony of Bolton and Mahoney revealed that after Mahoney's initial meeting with Bonidy to explore whether Pa. Early Stage would invest in Appellant, Mahoney formed an overall negative view of Appellant as a potential investment. (Mahoney Deposition at 38–39, 52). Bolton recalled

---

12. Further, even had the evidence shown that it was reasonably probable that Appellant and Liberty would have entered a contract, Appellant sets forth evidence of at most a "suspicion" that Appellees had interfered with the formation of that putative contract. Summary judgment is appropriately entered where the evidence is such that a jury would

have to reach a verdict on the basis of speculation or conjecture. *Cade,* 679 A.2d at 1271. Even in the context of other evidence advanced by Appellant, and even if believed, the evidence could establish nothing more than speculation or conjecture that Appellees had dissuaded Liberty from pursuing a business relationship with Appellant.

that after the initial meeting, Mahoney told him that the potential investment with Appellant was "not good enough for us to take to the next step." (Bolton Deposition at 43). Thereafter, Kohler asked Bolton to take another look at Appellant. (*Id.* at 45–47). Bolton agreed, and he and Mahoney went to Pittsburgh to meet with Appellant's representatives on June 12, 2001. (Mahoney Deposition at 53–56). Following this meeting, Mahoney's assessment "may have even got [sic] more negative than before." (*Id.* at 60). Nevertheless, Pa. Early Stage initiated due diligence, requested additional information from Appellant, and researched Appellant's relationship with IBM. (*Id.* at 60–64). Appellant, however, failed to provide to Pa. Early Stage the necessary information or documentation which Pa. Early Stage required for its examination of Appellant and Appellant's relationship with IBM. (Bolton Deposition at 15, 22, 30–32; Mahoney Deposition at 63–64, 66–67). Partly as a result of Appellant's failure to provide necessary information to Pa. Early Stage, the possible investment relationship simply "died on the vine." (Bolton Deposition at 22.) (*See also id.* at 15, 34; Mahoney Deposition at 64–65). Both Bolton and Mahoney testified regarding their independent business reasons for their lack of interest in pursuing a potential investment in Appellant, including limited investment funds then available to Pa. Early Stage. (Bolton Deposition at 23–24, 30–34; Mahoney Deposition at 64–65, 68–69, 71–76). As Bolton testified, "[Appellant] never got to the point of being a serious prospective investment." (Bolton Deposition at 34).

¶ 41 The evidence adduced by Appellant does not show that the prospective business relationship between Appellant and Pa. Early Stage was more advanced and serious than that which was described by Bolton and Mahoney. Audley testified that the day after Kohler had contacted Bolton to take a second look at Pa. Early Stage, Bolton had told her on the telephone that Pa. Early Stage "definitely" was "interested." (Audley Deposition, 12/18/01, at 139). This conversation would have been prior to the June 2001 meeting in Pittsburgh. Audley also testified, however, that by stating that Pa. Early Stage was "interested", she meant that her conversation with individuals at Pa. Early Stage was *not* "*negative*," that "[t]hey gave ... me the impression that they wanted to move further along with investigating [Appellant], meeting with the management team, getting additional details, performing—beginning to perform their due diligence." (Audley Deposition, 2/19/02, at 417–18) (emphasis supplied). This is hardly evidence that it was reasonably probable that Appellant and Pa. Early Stage would enter into a contractual relation.

¶ 42 Bonidy testified that his June 2001 meeting with Bolton and Mahoney concluded with a discussion of the accurate monetary valuation of Appellant. Bonidy testified that Bolton sharply disagreed with Appellant's valuation of itself at between $22 and $30 million. (Bonidy Deposition, 11/29/01, at 32). Bonidy further testified that Bolton said to him at this meeting: "The company is worth, if we are going to do the deal, the company is worth the mid to upper single digits." (*Id.* at 33). When asked if he had told Bolton that Appellant was not interested in dealing with Pa. Early Stage because of the disagreement over value, Bonidy replied: "I don't think I used those exact words, but I did say that I, as well as the board, as well as the common shareholders ... felt very strongly that [Appellant] had a value that was north of $20 million." (*Id.*) This testimony, rather than supporting a showing that it was reasonably probable that Appellant and Pa. Early Stage would

enter into a contract, compels the inescapable conclusion, as a result of Bonidy's admission, that Appellant and Pa. Early Stage were far apart on the critical issue of Appellant's value. No evidence was introduced to establish that this critical gap was ever bridged or even that efforts had been made by either party to try to close the gap.[13]

¶ 43 The final evidence advanced by Appellant is Kohler's testimony that Bolton said to him that Goldstein had told Bolton that it would be unnecessary for Pa. Early Stage to invest in Appellant's third-round of financing because Mellon would offer a bridge loan or some other instrument to meet Appellant's needs, even though Bolton had expressed an "interest" in Appellant. Appellant argues that this evidence should survive a hearsay challenge because it is not offered to prove that Goldstein told Bolton that Pa. Early Stage need not invest in Appellant, but only to show Bolton's "state of mind" for rejecting an investment opportunity with Appellant.

¶ 44 It is difficult to accept Appellant's argument. Appellant's tortious interference claim is not based on Pa. Early Stage's *belief* that Appellees did not wish it to invest; rather it is based on Appellant's allegations that Appellees had affirmatively interfered with Appellant's prospective business relationships.[14] Even if we agreed with Appellant that the out-of-court statement should have been admitted, which we do not, this statement goes no further than any other evidence in establishing that it was reasonably probable that Pa. Early Stage would have invested in Appellant but for Appellees' alleged interference. Kohler's statement reaffirms that Pa. Early Stage had an "interest" in Appellant, but nothing more with respect to the issue of whether it was reasonably probable that these two entities would have entered into a contract but for the acts of Appellees.

¶ 45 Viewing all of the evidence concerning the relationship between Pa. Early Stage and Appellant in the light most favorable to Appellant, we are compelled to conclude that the evidence cannot and does not support a finding that it was reasonably probable that Pa. Early Stage and Appellant would have entered into an investment contract. The evidence shows only that Pa. Early Stage exhibited an initial interest in exploring the possibility of investing in Appellant, giving it a second look, and performing only the beginning of a due diligence analysis. This evidence is insufficient to establish a prospective contractual relation, and thus a prospective business relationship, under our Supreme Court's holding in *Thompson Coal, supra.*

---

13. We understand that Appellant's argument is that Appellees had "published" a low valuation of Appellant in order to have a "down round," and that this information had been shared with Pa. Early Stage, and that the June 2001 meeting between Bolton and Mahoney, on behalf of Pa. Early Stage, and Bonidy, on behalf of Appellant, was a "set up," part of a conspiracy by Appellees that included Bolton and Mahoney. (*See* Audley Deposition, 2/19/02, at 418–19). However, there is not a shred of evidence supporting the allegation that Appellees had influenced Pa. Early Stage's valuation of Appellant or that Bolton and Mahoney's trip to Pittsburgh was a sham engineered to hide a conspiracy. Audley further admitted that she had no knowledge, just an "impression," that Appellees had had discussions with venture capital firms regarding the monetary value of Appellant. (*Id.* at 426–27).

14. Out-of-court statements may be admitted as a state-of-mind exception to the hearsay rule to show, *inter alia,* not the truth of the matter asserted, but the speaker's belief in what he or she has asserted. *Corbin v. Cowan,* 716 A.2d 614, 618–19 (Pa.Super.1998).

### (e) PTIA

¶ 46 Finally, the evidence regarding PTIA is also too weak to show that it was reasonably probable that Appellant would find an investor in the form of this firm. Appellees presented the deposition testimony of Jeannine M. Martilla, a technology investment specialist with PTIA, and Sharon Minnich, the director of PTIA from October 1999 to June 2001.[15] Both Martilla and Minnich consistently testified that PTIA never made a commitment to invest in Appellant, that there was no prospective contractual relationship between PTIA and Appellant, and that PTIA never communicated to Appellant that it would invest money of any amount in Appellant. (Martilla Deposition at 70, 91; Minnich Deposition at 79–80, 82). The testimony also established that Appellant never submitted an application to PTIA for financing, which was a pre-requisite for obtaining an investment from PTIA. (Martilla Deposition at 71–72). Further, any PTIA financing would have required prior board approval, and the PTIA board, for reorganization reasons, did not meet between June and November 2001, precluding any possibility of approval of financing during the relevant time frame of this matter. (*Id.* at 116, 138). Additionally, PTIA may invest only when a company seeking financing obtains lead investors, as PTIA would not be able to invest more than 20% of the projected investment. (*Id.* at 83, 132; Minnich Deposition at 78–79).

¶ 47 Martilla and Minnich also testified that Appellees did nothing to interfere with any prospective contract between PTIA and Appellant; that Appellees did not communicate to PTIA "an unreason-ably low valuation" of Appellant; and that PTIA, as a matter of course, did not compute the value of technology companies. (Martilla Deposition at 92–93, 110; Minnich Deposition at 80–82). In fact, Martilla testified that she had never heard of any of the Appellees until she saw Appellant's amended complaint. (Martilla Deposition at 56–58). Minnich testified that she had never had any dealings with Mellon regarding Appellant's project or anything else, nor did she know or ever speak with any Mellon employees, including Billerbeck. (Minnich Deposition at 49–50).

¶ 48 The evidence from Appellant offered to counter the testimony of Martilla and Minnich comes from the deposition testimony of Audley and Bonidy. Audley testified that she had obtained "a verbal commitment [of a 20% investment] that was conditioned upon bringing in a lead investor." (Audley Deposition, 12/18/01, at 115). Audley did not have anything in writing confirming, memorializing, or documenting this commitment. (*Id.*) Bonidy testified that he had a commitment from "the state" to invest 20% in Appellant's third-round of financing, although he did not describe the basis or source of his belief that Appellant had a commitment from PTIA. (Bonidy Deposition, 2/6/02, at 369).

¶ 49 Audley's and Bonidy's testimony cannot establish that it was reasonably probable that PTIA would invest in Appellant for two reasons. First, it is undisputed that before PTIA would invest, Appellant would have to obtain a lead investor or investors to contribute the first 80% of the desired financing. Second, before PTIA would invest, PTIA's board would

---

**15.** PTIA is a state agency that invests in Pennsylvania universities, community-based nonprofit concerns, and for-profit technology companies, upon approval by PTIA's twenty-one member board. (Minnich Deposition, 6/20/02, at 12; Martilla Deposition, 6/19/02, at 13). PTIA is now known as the Ben Franklin Technology Investment Authority. (*Id.* at 6).

first need to approve the deal, and there is no evidence that a "deal" was even placed in a form to present to this board. Again, the evidence shows no more than that Appellant had a "mere hope" of obtaining financing from PTIA, a hope that is not substantiated by any meaningful evidence in the record.

¶ 50 Appellant's arguments focus on evidence showing suspicious behavior on the part of Billerbeck linked with an abandonment of all interest from the venture capital firms Appellant had contacted. Before Appellant could have presented a jury with evidence of Billerbeck's behavior, however, it would have had to establish that its prospective contractual relations with the venture capital firms had progressed to a point showing, or were based on, a reasonable likelihood or probability that these relations would result in a contract. We cannot *assume* that Appellant *would have obtained* its investors absent the alleged wrongful acts of Appellees. *See Thompson Coal, supra.*

■ ¶ 51 Reviewing the evidence, even in the light most favorable to Appellant, giving Appellant all reasonable inferences from the evidence, it is impossible to conclude that a jury would find that, but for the alleged wrongful acts of Appellees, it was reasonably probable that Appellant would have entered into an investment contract with *any* of the nine venture capital firms Appellant identified in its amended complaint. Again, the standard is an *objective one,* requiring adequate proof, which is sorely missing here. *Thompson Coal, supra* at 209, 412 A.2d at 471. Accordingly, we determine that Appellant has failed to establish the first element of its claim of tortious interference with prospective business relations. Therefore, we hold that the trial court did not err in entering summary judgment and dismiss-

ing Appellant's count in tortious interference with prospective business relations.

## II. Breach of Fiduciary Duty

¶ 52 Appellant next argues that Billerbeck and Mellon breached their fiduciary duty to Appellant and that Goldstein and MVI aided and abetted this breach. Although the trial court did not address these issues, because our scope of review of a grant of summary judgment is plenary and our standard is the same as that of the trial court, we will address Appellant's arguments in the interests of judicial economy.

■ ¶ 53 Section 1712(a) of the Business Corporation Law of 1988, as amended, provides in relevant part:

A director of a business corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director ... in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care ... as a person of ordinary prudence would use under similar circumstances.

15 Pa.C.S.A. § 1712(a). Our Supreme Court has stated with regard to the statutorily-imposed fiduciary duties of corporate directors and officers:

[Directors and officers] must devote themselves to the corporate affairs with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed also by their fellow shareholders.... In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential advantage to it, the law will not permit him

to seize the opportunity for himself; if he does so, the corporation may elect to claim all of the benefits of the transaction. Nor is it material that his dealings may not have caused a loss or been harmful to the corporation; *the test of his liability is whether he has unjustly gained enrichment.*

*Seaboard Industries, Inc. v. Monaco,* 442 Pa. 256, 261–62, 276 A.2d 305, 309 (1971) (quoting *Bailey v. Jacobs,* 325 Pa. 187, 194, 189 A. 320, 324 (1937)) (emphasis added). As we have held, "[t]he *sine qua non* in cases where corporate directors are alleged to have breached their fiduciary obligation is that the allegedly wrong-doing directors must have been *unjustly* enriched." *Pink Lady, Inc. v. William Penn Loan Co.,* 189 Pa.Super. 187, 150 A.2d 154, 156 (1959) (emphasis added). *See also CST, Inc. v. Mark,* 360 Pa.Super. 303, 520 A.2d 469 (1987).

▌ ¶ 54 Appellant essentially posits three theories supporting its claim that Billerbeck and Mellon breached their fiduciary duty.[16] First, it argues that Billerbeck and Mellon did "all that [they] could to deter others from investing in [Appellant's third] round [of financing] so as to permit Mellon ... to receive unreasonably favorable terms in connection with [Appellant's third] round of financing." (Amended Complaint, at ¶ 103(a)). Second, Appellant argues that the evidence shows that Billerbeck proposed such onerous terms for a bridge loan that had Appellant accepted them, all other venture capital firms would have declined to invest in Appellant, paving the way for Mellon to propose third-round financing on terms advantageous to itself. Third, Appellant

argues that Billerbeck devised and "published" an "unreasonably low" valuation of Appellant with the aim of discouraging other investors so that the third-round of financing would be met "on Billerbeck's terms[,] ... greatly increase[ing Mellon's] percentage interest in [Appellant] while greatly diminishing the percentage interest of the individual investors. Billerbeck's interest in providing an opportunity for Mellon ... to grab the lion's share of the proceeds of any sale is the motive behind the misconduct." (Appellant's Reply Brief at 12). Totally unexplained, however, is why Mellon did not act upon the scheme alleged; *i.e.,* it never provided third-round financing such that it could reap the benefit of all of its alleged nefarious dealings, instead allowing Appellant to succumb to bankruptcy.

¶ 55 Appellant's first contention is essentially a restatement of its argument that Appellees tortiously interfered with Appellant's prospective business relations. As we previously have determined, Appellant has failed to produce evidence that, but for the actions of Appellees, it would have entered into its sought-for investment contracts with one or more venture capital firms. Moreover, Appellees never provided third-round financing to Appellant on *any* terms, whether favorable to them or not, and Appellant has admitted that Mellon and the other Appellees were under no obligation to provide third-round financing. Also, Appellant does not identify or even suggest how Billerbeck or Mellon was unjustly enriched by Appellant's failure to obtain third-round financing.

---

**16.** Billerbeck was a non-voting director and Mellon was a 20.4% shareholder of Appellant. Appellant argued before the trial court that because Billerbeck was permitted to supply information to Mellon concerning Appellant's business activities, Mellon owed the same fiduciary duties to Appellant as did Billerbeck. (Trial Court Opinion at 3, n. 2). Appellees have not challenged Appellant's assertion that Mellon owes the same fiduciary duties to Appellant as does Billerbeck.

¶ 56 Appellant's second contention relates to the onerous terms of Mellon's proposed bridge loan. Without citation to authority, Appellant baldly asserts that it is immaterial for purposes of its count in breach of fiduciary duty that Appellant rejected the onerous terms. However, Appellant is required to prove that the individual breaching his or her fiduciary duty was *unjustly* enriched. *Seaboard Industries, supra* at 262, 276 A.2d at 309; *Pink Lady, supra.*

¶ 57 Here, Appellant did not make *any* allegation or adduce *any* evidence of fraud. Although Appellant contends that the proposed bridge loan was unfair, Appellant rejected the terms set by Mellon for such a loan,[17] and through its representation by a prestigious Philadelphia law firm, negotiated new terms for a bridge loan that Appellant's board of directors (Billerbeck and Jones not voting) accepted. Because Appellant willingly entered into a loan with Mellon in an arms-length transaction on terms negotiated by counsel, there is no justifiable conclusion that Mellon or Billerbeck was *unjustly* enriched by the transaction. Again, Appellant admits that none of the Appellees was under any obligation to lend or invest any further funds to or in Appellant. Further, we note that the bridge loan, in the amount of $750,000, was made not only by Mellon, who loaned $375,000, but also by Draper (which loaned $225,000) and RRZ (which loaned $150,000).

¶ 58 Appellant's last contention regards Billerbeck's alleged scheme to "drive down" the value of Appellant so that Mellon could finance Appellant with favorable terms, achieve a greater ownership share in Appellant, and then "flip" its investment with a quick sale of Appellant. We are compelled to conclude that a jury **could not** return a verdict in favor of Appellant for breach of fiduciary duty on these allegations because *there is absolutely no evidence in the record to support them,* even in light of the suspicious statements made by Billerbeck to Bonidy and Capretto, which statements we accept as true for purposes of our review. Once again, Appellant offers no explanation for Mellon's failure to carry out its alleged plan of taking over Appellant and selling it.

¶ 59 Appellant appears to be arguing that Billerbeck, by the simple act of computing a valuation of Appellant below $10 million when Appellant's board had agreed on a value of $23 million, and by concluding that Appellant's third-round of financing would have to be a "down round," even though Billerbeck had a factual financial basis for reaching these conclusions, breached his fiduciary duty. However, there is no basis to read Section 1712(a) of the Business Corporation Law so strictly. Appellant is on safer ground in arguing that fiduciary duties were breached based on the allegation that the low valuation was "published" to prospective venture capital firms with the aim of discouraging them from investing in Appellant. Unfortunately for Appellant, this argument must then fail because the record lacks proof of any such publication. The lone piece of evidence in the record concerns a statement purportedly made to Audley by an individual from Phoenician that Phoenician "agreed" with Mellon's valuation.

¶ 60 Again, we reiterate our grasp of Appellant's argument that if Phoenician's comment is taken in the context of Billerbeck's suspicious comments to Bonidy and Capretto, Kohler's hearsay testimony regarding statements allegedly made by Goldstein, and Appellant's failure to find any actual new investors despite the initial expression of interest by some investors, a

---

17. Mellon, not Billerbeck individually, offered a bridge loan to Appellant.

conspiracy may appear to take form. However, our charge to give the non-moving party all *reasonable* inferences deducible from the evidence in reviewing a grant of summary judgment does not require that we check our common sense at the courtroom door—in fact, just the opposite. In order for a jury to accept Appellant's theory of its case, the jury would have to find that Billerbeck and Mellon, by virtue of their position in the venture capital community, were able to dissuade at least nine if not all thirty to thirty-five venture capital firms contacted by Audley, *including a Commonwealth agency whose decisions were controlled by a twenty-one member board,* from investing in Appellant despite their strong desire to invest. The jury would also have to accept that *every single witness from the nine named venture capital firms,* including two Commonwealth employees, perjured themselves in order to prevent this conspiracy from coming to light. The jury would also have to accept that all of the venture capital firms would, for unstated reasons, reject the strength of Appellant's business plans, resources, and history as presented by Bonidy, Audley, and other representatives of Appellant in favor of the valuation placed on Appellant by Billerbeck and Mellon, and that once Billerbeck and Mellon "poisoned the well," nothing presented by Bonidy or others could convince an investor of Appellant's business strength and value. The jury would further have to accept that Billerbeck and Mellon did this so that they could present Appellant with a bridge loan with onerous terms, with the additional goal that Mellon would provide third-round financing on "its terms." The jury would also have to accept that, despite the brilliance of Billerbeck and Mellon in scuttling all investor interest in Appellant, and their encouraging, during the course of this litigation, at least eleven unconnected individuals to perjure themselves, the result of Billerbeck and Mellon's scheme was bankruptcy for Appellant, not a quick and enhanced profit for Mellon.[18] Finally, the jury would have to make these findings without the pesky but necessary element of actual evidence.

¶ 61 Instantly, the evidence adduced by Appellant is inadequate to support the allegations in its amended complaint, and it is based principally on speculation and conjecture. Appellant has failed to adduce any evidence showing a reasonable likelihood or probability that it would have entered into a contractual relationship with a venture capital firm but for the actions of Appellees. Further, the evidence adduced by Appellant intended to show a breach of fiduciary duty is insufficient because (1) there is no evidence of an unjust enrichment by Billerbeck or Mellon, a prerequisite to the finding of such a breach, and (2) a jury would be required to glue the shreds of Appellant's evidence together with speculation and conjecture in order to return a verdict in Appellant's favor. We are specifically charged, in the context of a summary judgment determination, with preventing cases inadequate in evidence from going forward. Accordingly, for all of the reasons set forth above in exhaustive detail, we conclude that the trial court did not err in granting summary judgment to Appellees, and we affirm the court's order.

¶ 62 Order affirmed.

---

**18.** Again, Appellant fails to explain why Mellon never invested the third-round of financing so that it could profit from its alleged extensive and nefarious acts.