2016 PA Super 297

| | |
|---|---|
| CORNWALL MOUNTAIN INVESTMENTS, L.P., AND RANGE RESOURCES – APPALACHIA, LLC<br><br>v.<br><br>THOMAS E. PROCTOR HEIRS TRUST, INTERNATIONAL DEVELOPMENT CORPORATION, PENNLYCO, LTD., VIRGINIA ENERGY CONSULTANTS, LLC, ATLANTIC HYDROCARBON, LLC, CHIEF EXPLORATION AND DEVELOPMENT, LLC, QUEST EASTERN RESOURCE, LLC, AND EXCO HOLDING (PA), INC.<br><br>v.<br><br>SOUTHEASTERN ENERGY PRODUCTION COMPANY<br><br>APPEAL OF: TRUSTEES FOR MARGARET O.F. PROCTOR TRUST | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br><br><br><br><br><br><br>No. 1706 MDA 2015 |

Appeal from the Order Entered September 3, 2015
In the Court of Common Pleas of Lycoming County
Civil Division at No(s): 11-00718

BEFORE:  BOWES, OTT AND PLATT,* JJ.

OPINION BY BOWES, J.:                    **FILED DECEMBER 21, 2016**

The Trustees of the Margaret O.F. Proctor Trust ("Trustees") appeal

from the final order granting judgment on the pleadings in favor of Cornwall

_____

* Retired Senior Judge assigned to the Superior Court.

Mountain Investments, L.P. and Range Resources–Appalachia, LLC (collectively "Cornwall"),[1] in this action to quiet title to subsurface minerals, oil, and gas lying beneath three thousand acres in Lycoming County ("the Property"). After thorough review, we affirm.

On October 27, 1890, Thomas E. Proctor purchased approximately 7000 acres of unseated land[2] located in Cogan House Township and Lewis Township from Harriet Land by general warranty deed.[3] Four years later,

_____

[1] Cornwall entered into an oil, gas, and coalbed methane lease with Range Resources on April 30, 2007.

[2] "Seated land was property that had been developed with residential structures, had personal property upon it that could be 'levied upon for the tax due', or was producing regular profit through cultivation, lumbering, or mining." **Herder Spring Hunting Club v. Keller**, 143 A.3d 358, 363 (Pa. 2016) (quoting Robert Grey Bushong, Pennsylvania Land Law, Vol 1, § 469(II) at 500-501 (1938)). In contrast, unseated land is described as "wild" land and includes all land that did not meet the requirements for being seated. **Id**. § 469(IV) at 501.

[3] The Proctor Heirs Trust pled that it owned 100% of the oil, gas, and minerals beneath the Property. **See** Answer of Proctor Heirs Trust at ¶2. Trustees herein maintained, however, that Thomas Proctor purchased this acreage subject to a prior reservation in the deed recorded by Clarence Biddle, a predecessor of Harriet Land. According to Trustees, in an 1867 deed to S. Bennet, a copy of which was appended to the Answer, Mr. Biddle excepted and reserved for himself and his heirs "all ores of iron, lead, copper and other minerals which may be discovered produced or found on said lands and also three-fourths part of all mineral coals & all oils which may be discovered or produced on said lands." Thus, Trustees contended that the interest Mr. Proctor acquired from Harriet Land only included the surface, the natural gas, and one-fourth of the coal and oil, and that when Mr. Proctor subsequently conveyed the surface estate to Elk Tanning, reserving all natural gas, oil, and minerals, the reservation only consisted of natural gas

*(Footnote Continued Next Page)*

Mr. Proctor and his wife conveyed that acreage, part of which consisted of the Property herein, to Elk Tanning Company, but reserved "all the natural gas, coal, coal oil, petroleum, marble and all minerals of every kind and character in, upon, or under the said land." Proctor died in 1894, and his heirs inherited the reserved subsurface estates. In 1978, Margaret O. F. Proctor placed her alleged 1/16th interest in that mineral estate in a trust. In 1980, the remaining heirs conveyed their claimed 15/16th interest to the Proctor Heirs Trust.

In 1903, Elk Tanning conveyed the surface of the 7,000-acre property to Central Pennsylvania Lumber Company, "subject to all the exceptions, reservations, covenants, stipulations, agreements" contained in the deeds recited therein, one of which was the Proctor deed. By deed dated July 24, 1919, Central Pennsylvania Lumber Company conveyed to Henry Hess, Dorr Wolfe and John Blair, as trustees of the Cornwall Mountain Club, 2,813.75 acres of that property located in Cogan House and Lewis Townships, subject to among other reservations, reservations for rights of way for wagon roads, as well as timber, trees, logs, wood and other forest products. David M. Wolfe and the members of the Cornwall Mountain Club conveyed that

_(Footnote Continued)_ ————————

and a one-fourth interest in coal and oil. The trial court found, however, that any interest reserved by Mr. Biddle was lost in a June 1890 tax sale whereby Harriet Land acquired title to both the surface and the mineral estates, which she then sold to Thomas Proctor. Trustees have not challenged that ruling on appeal.

- 3 -

property to the Cornwall Mountain Club, a corporation, by deed dated July 9, 1920, "EXCEPTING AND RESERVING, NEVERTHELESS, unto Thomas E. Proctor, his heirs and assigns, all the natural gas, coal, coaloil [sic], petroleum, marble and all minerals of every kind and character, in, upon or under the said lands hereinbefore mentioned and described, and every part thereof, or which may at any time hereinafter be discovered in, upon or under said lands, or any part thereof, with the right to enter upon said lands for purposes of exploration, and for the taking away the said natural gas, coal, coal oil, petroleum, marble or other minerals . . . .as in the deed from Thomas E. Proctor and wife to Elk Tanning Company."

The Property consists of 2,842 acres, comprising Warrants 5751 (1170 acres), 5753 (716 acres), part of 5666 (545 acres), part of 5668 (240 acres) in Lewis Township, and a four acre parcel in Warrant 5666, located in Cogan House Township, designated by the Lycoming County Assessment Office as tax parcel 24-248-100.[4]  Cornwall pled that Thomas Proctor and his heirs held the only reservation or interest in the minerals, which included the oil and gas.

There is no indication in the record that the mineral rights in the Property were separately assessed for tax purposes prior to 1930.

_____

[4] Defendants International Development Corporation and Pennlyco claim ownership of a portion of Warrant 5753 by virtue of 2000 and 1992 quitclaim deeds respectively.

Assessment records from 1930 and 1931 reveal, however, that the surface and subsurface estates were separately assessed for tax purposes, and the subsurface mineral rights estate was identified as belonging to "Thomas E. Proctor & Heirs." In both 1930 and 1931, the mineral rights were assessed at $.50 per acre with the surface assessed at $1.00 per acre.

In June 1932, the mineral rights estate was sold to the surface owner, Cornwall Mountain Club, at a tax sale. The treasurer subsequently issued five deeds conveying the mineral rights of the unseated land, which were recorded in 1934. Thereafter, according to Cornwall, its predecessor Cornwall Mountain Club owned both the surface and the mineral rights in the Property, including the oil and gas interests. Cornwall Mountain Club transferred title to Cornwall Mountain Investments, L.P. on June 14, 2010, by general warranty deed.

On April 29, 2011, Cornwall commenced this quiet title action against the Proctor Heirs Trust[5] and the other defendants to resolve competing claims of ownership to the gas on the property. Southwestern Energy intervened, and Trustees herein were joined. Cornwall claims ownership of both the surface and the subsurface mineral and oil and gas rights from the

_____

[5] The trustees of the Proctor Heirs Trust have also appealed at No. 170 MDA 2015, and are advancing identical arguments on appeal.

tax sale conducted in 1932.[6] Range Resources joined the proceedings and asserted a claim to the gas and oil as Cornwall's lessee.

Trustees trace their ownership of gas to the 1894 deed conveying the surface of the Property to Elk Tanning Company, but reserving to Thomas E. Proctor and his heirs the rights to "all the natural gas, coal, coal oil, petroleum, marble, and all minerals of every kind and character in, upon, or under the said land." 1894 Deed. Trustees maintain that the term "minerals" as used in the 1930 and 1931 assessments and the 1932 tax deed did not include their interests in the oil and gas. Accordingly, they contend that the 1932 tax deeds did not convey to Cornwall Mountain Club any right, title or interest in the oil or gas. Answer, 6/18/14, at ¶2.

In support of their position, Trustees invoked the presumption under Pennsylvania law that oil and gas are not included in a reservation of minerals only. Additionally, they argued that the oil and gas at issue herein were undiscovered at the time of the tax sale and could not be valued or assessed. The Trustees also pled that the Proctor heirs did not receive the constitutionally-mandated notice of the tax sale, and that there were additional irregularities in the sale that rendered it void. Finally, Trustees alleged that four-fold taxation, not title divestiture, was the only statutory

_____

[6] Cornwall also claimed title through adverse possession, but voluntarily discontinued that claim on or about July 15, 2015.

remedy for failure to pay taxes. New Matter, 6/18/14, at ¶12. The Trustees also filed counterclaims against Cornwall and Range Resources and cross-claims against the other defendants.

On January 14, 2014, Cornwall moved for partial judgment on the pleadings based on the 1932 tax sale.[7] The trial court granted the motion on August 4, 2014, concluding that the assessment of an interest described as "Mineral Rights Only" included oil and gas. Moreover, the court declined to invalidate the tax sale based on an assessor's alleged inability to value the oil and gas interest, and held further that, the tax sale could not be invalidated by retroactively applying *Independent Oil & Gas Association of Pennsylvania v. Bd. of Assessment Appeal of Fayette County* ("*IOGA*"), 814 A.2d 180 (Pa. 2002). In addition, the trial court found no proof that the Proctor heirs did not receive proper notice of the tax sale.

Trustees moved for reconsideration, alleging that the trial court erred in requiring it to prove the lack of proper notice to avoid judgment on the pleadings. The court granted reconsideration on September 4, 2014, limited to whether the taxing authority's failure to provide proper notice of the tax sale rendered it void. The court concluded that there was a dispute of fact

---

[7] The trial court refers to "tax sales" since five parcels of mineral rights were sold at the June 13, 1932 tax sale. For convenience, we refer to the multiple sales on that date as the 1932 tax sale.

as to the validity of the tax sale, and thus judgment on the pleadings was improper.

Range Resources filed a motion for reconsideration of that decision. On March 31, 2015, the trial court reinstated partial judgment on the pleadings, based on a finding that the six-year statute of limitations barred any challenge to the adequacy of the notice of the tax sale. On July 30, 2015, Cornwall and Range Resources filed another motion for judgment on the pleadings as to the pending counterclaims and cross-claims, which was granted on September 3, 2015, based upon the court's prior finding that Cornwall owned the right to the oil and gas.

The Trustees timely appealed and they present four questions for our review:

1. Because of the presumption that an instrument conveying "minerals" does not convey oil or gas, absent clear and convincing proof of a contrary intention, did the trial court erroneously enter judgment on the pleadings, finding that tax assessment and sale of "Mineral Rights Only" conveyed oil and gas rights?

2. Because political subdivisions cannot tax subsurface oil and gas, and because any assessment would have been otherwise invalid because there was no basis to assess or value the oil and gas at issue, did the trial court erroneously hold that a tax sale could divest title to oil and gas?

3. Where political subdivisions conducting a tax sale (i) failed to give proper pre-sale notice to the owners of subsurface oil and gas rights in the manner required by governing statutes and (ii) resorted to constructive notice by publication that runs afoul of constitutional due process guarantees, did the trial court

erroneously enter judgment on the pleadings declaring that the sale nevertheless divested title to oil and gas?

4. Because the expiration of a statute of limitations cannot render a void tax sale valid, and because the statute of limitations does not preclude assertion of a defense to a quiet title action, did the trial court err in entering judgment on the pleadings based upon expiration of a six-year statute of limitations?

Appellants' brief at 4-5.

In deciding whether judgment on the pleadings is warranted in favor of a plaintiff, the trial court is limited to the pleadings, *i.e.*, the complaint, answer and new matter, and any relevant documents properly attached to those pleadings. Furthermore, the trial court must draw all inferences and assume all concessions in favor of the non-moving party. Judgment on the pleadings should only be granted when there are no genuine issues of fact and the moving party is entitled to judgment as a matter of law. *Consolidation Coal Co. v. White*, 875 A.2d 318, 325 (Pa.Super. 2005).

In reviewing the grant of judgment on the pleadings, "our scope of review is plenary." *Mellon Bank, N.A. v. National Union Ins. Co.*, 768 A.2d 865, 868 (Pa.Super. 2001). "We must determine whether the trial court's ruling was based on a clear error of law or whether the pleadings disclosed facts which properly should go to the jury." *Id*. We will reverse only if the trial court committed a clear error of law or if the pleadings disclose facts that should be submitted to a trier of fact. *Sisson v. Stanley*, 109 A.3d 265, 274 (Pa.Super. 2015). Specifically, "[i]n reviewing an action

to quiet title, an appellate court's review is limited to determining whether the findings of fact are supported by competent evidence, whether an error of law has been committed, and whether there has been a manifest abuse of discretion." ***Regions Mortgage, Inc. v. Muthler***, 889 A.2d 39, 41 (Pa. 2005). "We will not reverse a determination of the trial court in a quiet title action absent an error of law or capricious disregard of the evidence." ***Consol Pa. Coal Co. v. Farmers Nat'l Bank of Claysville***, 960 A.2d 121, 125 (Pa.Super. 2008). Additionally, we are mindful that Cornwall, as the plaintiff in this quiet title action, bears the burden of proof and it must recover on the strength of its own title. ***Herder Spring Hunting Club v. Keller***, 143 A.3d 358, 372 (Pa. 2016).

In September 2016, the parties requested and were afforded the opportunity to file supplemental briefs addressing the impact of the Supreme Court's intervening decision in ***Herder Spring***, ***supra***, on the instant appeal. At issue therein was whether a 1935 tax sale of unseated land conveyed only the surface estate or the entire warrant, which included a subsurface mineral estate. Our High Court found that, since neither the owners of the subsurface rights nor the purchasers of the surface rights in 1899 reported the severance and transfer of the property interests to the taxing authorities as statutorily required, the commissioners assessed and

taxed the warrant in its entirety.[8]  When taxes on the surface estate became

delinquent and the property was sold at a tax sale, the purchaser acquired

the entire property including subsurface mineral rights that were not

separately assessed.

As in **Herder Spring**, we are dealing with interests in unseated land

sold at tax sale.  However, our High Court expressly limited its holding

therein to quiet title actions involving formerly unseated land sold at tax sale

prior to 1947, **where the tax sale involved assessments that did not**

**specify whether they involved the surface or subsurface rights**.  The

separate assessment of mineral and surface rights herein, together with the

---

[8]  In **Herder Spring Hunting Club v. Keller**, 143 A.3d 358, 368 (Pa. 2016), the Court delineated the requirements of the Act of 1806:

> "[I]t shall be the duty of every holder of unseated lands" to provide the county commissioners with a signed statement describing the tract of land and "the name of the person or persons to whom the original title from the commonwealth passed, and the nature, number, and date of such original title."

Regarding future transfers, the Act provided:

> It shall be the duty of every person hereafter becoming a holder of unseated land, by gift, grant, or other conveyance to furnish a like statement, together with the date of the conveyance to such holder, and the name of the grantor within one year, from and after such conveyance.

Act of 1806 Section 1.  The penalty for failure to report was four times the amount of tax for which the land would have been liable.

fact that only the mineral rights estate was sold at tax sale, indicates that the instant case, while instructive, is not on all fours with **Herder Spring**.

The Trustees attempt to distance themselves from **Herder Spring** based upon alleged irregularities in the assessments of the mineral rights and subsequent tax sale in this case, including: a valuation that was performed outside the cycle for triennial assessments; assessments recorded in different handwriting than the other entries; assessments of mineral rights lying only beneath the surface of the Cornwall Mountain Club property; the subsequent conviction of the county treasurer of sixteen counts of fraud and forgery in connection with his official duties for crimes commencing as early as 1932; and the lack of compliance with the statutory notice requirements for the sale of unseated interests in land. **Herder Spring** did not involve such collateral attacks on the tax sale, and consequently, there was no issue as to whether such attacks were time-barred.

Nonetheless, several of the legal issues herein were addressed and resolved in **Herder Spring**, and we thus rely on portions of the Supreme Court's analysis herein. The Court construed the Act of 1815, § 4, as set forth at 72 P.S. § 6091, and its decision in **Bannard v. New York State Natural Gas Corporation**, 293 A.2d 41, 49 (Pa. 1972), as precluding any

challenge to irregularities in assessment or in the process affecting title in the purchaser after the two-year redemption period.[9] The Court also rejected a challenge to the validity of the tax sale in that case based on the holding in *Independent Oil & Gas Assn of Pa. v. Bd. of Assessment Appeals*, 814 A.2d 180 (Pa. 2002) ("*IOGA*"), that there was no statutory authority for the assessment and taxation of oil and gas in the ground. The *Herder Spring* Court affirmed its holding in *Oz Gas v. Warren Area School District*, 938 A.2d 274 (Pa. 2007), that *IOGA* is to be applied prospectively only. Finally, the *Herder Spring* Court concluded that notice by publication for the sale of unseated land for delinquent taxes was "reasonable given the difficulties of ascertaining ownership information relating to unseated owners," the protection afforded by the two-year redemption period, and that such notice did not deprive a property owner of due process.

---

[9] The Act of 1815 provided that after two years:

> In no other case and on no other plea, shall an action be sustained . . . [and] no alleged irregularity in the assessment, or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal.

*Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016) (quoting Act of 1815). A five-year redemption period applied if the property was purchased by the county commissioners at tax sale.

The Trustees' first position herein is that the 1932 assessment and sale of "Mineral Rights Only" did not include or convey the subsurface oil and gas. They cite **Butler v. Charles Powers Estate**, 65 A.3d 885, 889 (Pa. 2013), where the Supreme Court upheld the vitality of the presumption announced in **Dunham & Shortt v. Kirkpatrick**, 101 Pa. 36 (Pa. 1882) ("**Dunham** Rule"), for the proposition that a reference to "minerals" in a reservation in a private deed does not include oil and gas, and contend that it applies to a treasurer's deed. Trustees attempt to distinguish **Bannard**, where our High Court held that the **Dunham** Rule does not apply to tax sales, and argue that **Bannard** only means that the assessment rather than the deed controls. They assert that the **Bannard** Court did not preclude application of the rebuttable **Dunham** presumption in the context of a tax sale, but simply found the presumption rebutted in that instance by evidence that oil and gas rights were included in the assessment.

Cornwall relies upon **Bannard**, **Butler**, and their progeny for the proposition that the **Dunham** Rule only applies to reservations of minerals in transactions between private individuals. In seeking to apply it to tax deeds, they maintain that Trustees are extending application of the rule. Cornwall asserts that an assessment of "minerals" in **Bannard** included the oil and gas, and cites **Bannard** as rejecting the notion that only minerals known to exist at the time and having value were included in the assessment.

We begin our analysis with **Butler**, which involved a deed executed in 1881, that reserved to the grantor the subsurface and removal rights of "one-half [of] the minerals and Petroleum Oils" contained beneath the subject property. The issue therein was whether that reservation included the natural gas contained in the Marcellus Shale Formation. The Supreme Court upheld the trial court's application of the entrenched **Dunham** Rule, finding that for purposes of private deed transfers, natural gas and oil are presumptively not considered minerals. Absent clear and convincing parol evidence produced by the proponent of the reservation to the contrary, the **Butler** Court reaffirmed that the term "mineral" in a private deed did not include oil or gas.[10] Since the reservation therein did not specifically reference natural gas, any natural gas found within the Marcellus Shale beneath the subject land was not intended by the executing parties to the deed to be encompassed within the reservation.

We are not dealing herein with a reservation in a private deed and the issue is not the intent of the grantor at the time of such a reservation. We

_____

[10] As our High Court acknowledged in **Butler v. Charles Powers Estate**, 65 A.3d 885, 886-887 (Pa. 2013), various Pennsylvania statutes, such as the Municipalities Planning Code, define natural gas as a mineral. **See** 53 P.S. §10107; **see also Huntley & Huntley, Inc. v. Borough of Oakmont**, 964 A.2d 855, 858 (Pa. 2009) (recognizing that while natural gas may be classified as a mineral under the Municipalities Planning Code, "Pennsylvania common law has applied a rebuttable presumption in the context of a private deed conveyance that the term 'mineral' does not include oil or gas.").

read **Butler** as affirming the continued vitality of the rebuttable presumption of the **Dunham** Rule, but only with regard to reservations in conveyances between private individuals. We find **Bannard**, an ejectment action, to be more closely aligned with the instant case and controlling herein.

In **Bannard**, the grantor reserved coal, fire-clay, oil, gas and other mineral rights when he conveyed his surface rights. That interest was described and assessed as a mineral estate. Years later, when taxes were not paid on the mineral estate, it was sold at a tax sale. As herein, the treasurer's deed and its underlying assessment referred only to "minerals." The appellants maintained, as the Trustees contend herein, that based on the **Dunham** presumption, the tax sale did not convey the rights to the oil and gas. The **Bannard** Court rejected that position, holding that "In a tax sale, . . . the presumption does not obtain: the deed is based on the assessment and conveys the interests in land which are properly included within the assessment." **See Wilson v. A. Cook Sons Co.**, 148 A. 63 (Pa. 1929) (finding oil and gas are minerals and tax sale of minerals transferred those interests). We find **Bannard** and **Wilson** controlling on this issue, and hence, find no merit in Trustees' claim that oil and gas were not minerals sold in the 1932 tax sale of minerals.[11]

---

[11] The reasoning in **Herder Spring** further supports our conclusion that oil and gas interests were subject to assessment as minerals. Therein, our High
*(Footnote Continued Next Page)*

Trustees contend further that since oil and gas beneath the surface had no taxable value, an assessment of minerals would not include them. The same argument was advanced and rejected in **Herder Spring**. Therein, the owners of the mineral rights relied upon **F.H. Rockwell & Co. v. Warren County**, 77 A. 665, 666 (Pa. 1910), in support of their contention that a mineral tax sale did not encompass their interest in oil and natural gas because those rights had no taxable value in 1935. They maintained that only minerals that were in current production or deemed to have value through evaluation of neighboring properties were taxable and subject to a tax sale. The Court disagreed, stating that the issue was not whether the minerals had an assessable value, but whether the assessment addressed the warrant as a whole or merely the surface estate. Otherwise, the Court reasoned, courts today would face the issue as to whether certain minerals

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯

Court construed the Act of 1806 as requiring owners of estates in land to provide the taxing authority with a description of their severed estates. The failure to do so resulted in an assessment of the entire warrant, and at a subsequent tax sale, the conveyance of both the surface and the subsurface estates. If, indeed, the Proctor Heirs did not own the entire mineral estate, but only one-quarter of the coal and oil and all of the gas, as they contended herein, it was incumbent upon them to notify the taxing authority that the mineral estate had been severed and to delineate their ownership interest so that it could be separately assessed. **See** Act of 1806, _supra_ n.8. There is no allegation that such notice and description were given. Under the rationale of **Herder Spring**, one could argue that, absent such notice, a tax sale purchaser of mineral rights would acquire all mineral rights if any mineral estate owner neglected to pay taxes.

had taxable value more than one hundred years ago.[12]   Our High Court reasoned that owners of oil and gas interests had a duty to notify the taxing authority of their separate estate in oil and gas, regardless of whether oil and gas were being developed.[13]   Thus, the lack of taxable value did not determine the nature of the interest assessed and sold at tax sale.   For these reasons, we find that the tax sale of the minerals included the oil and gas interests.

We turn now to the first of two attacks by the Trustees on the validity of the tax sale: that the assessment of their oil and gas interest was not statutorily authorized.   They cite **IOGA**, **supra**, for the proposition that oil

_____

[12] Our High Court reasoned that such a theory "could lead to a windfall for fee simple owners, who years after the tax sale of the entire property could claim that the prior tax sale should be deemed to have exempted specific mineral rights that at the time of the sale had no value, but today are coveted, with Marcellus Shale being an obvious example.   Such a theory would result in chaos whereby courts today would be required to determine whether certain minerals or other subsurface rights would have had taxable value in the late 1800s." **Herder Spring Hunting Club v. Keller**, 143 A.3d 358, 373-74.
.

[13] Trustees proffered an expert who would have testified that oil and gas interests were separately assessed from hard minerals at the time, arguably lending support to Trustees' position that "minerals" did not include oil and gas.   However, there was no separate assessment for oil and gas herein, perhaps because the Proctor Heirs did not notify the Lycoming County commissioners of the nature of their oil and gas interest for assessment purposes.   Under the rationale of **Herder Spring**, sale of the mineral estate for delinquent taxes would have operated to extinguish any estate in oil and gas that was not separately assessed, and operated to convey all subsurface interests at the 1932 tax sale.

and gas interests cannot be taxed while in the ground and allege the trial court erred in refusing to apply **IOGA** retroactively. Since Lycoming County and the municipalities lacked the authority to assess such interests, Trustees maintain that the tax sale of their oil and gas interest for nonpayment of taxes was invalid.

In **Oz Gas**, **supra**, our High Court refused to apply **IOGA** retroactively to invalidate years of tax assessments on oil and gas. Trustees argue, however, that since the instant case involves a determination of whether an unlawful tax assessment can divest a landowner of his property, not a retroactive refund of taxes, **Oz Gas** is not controlling on the retroactivity issue. Trustees assert that the factors determining whether a decision should be retroactively applied, which were identified in **Chevron Oil v. Huson**, 404 U.S. 97 (1971), must be analyzed on a case-by-case basis. Appellants' brief at 25-26 (citing **Christy v. Cranberry Volunteer Ambulance Corps, Inc.**, 856 A.2d 43 (Pa. 2004) (recognizing that generally Pennsylvania applies decisions involving changes in the law in civil cases retrospectively, *i.e*., to cases pending on appeal). On the facts herein, Trustees contend that analysis of the **Chevron Oil** factors militates in favor of a retroactive application of **IOGA**.[14]

---

[14] The **Chevron** analysis for determining retroactivity as a jurisprudential matter looks to:
*(Footnote Continued Next Page)*

- 19 -

Our Supreme Court rejected that same argument in **Herder Springs**, based on its reasoning in **Oz Gas**. The **Herder Spring** Court reiterated the "need to protect taxing authorities' reliance on oil and gas taxes," and concurred in the **Oz Gas** trial court's prediction that "[r]etroactive application of **IOGA** would, in effect, invalidate each of those tax sales, perhaps leading prior owners to seek return of the properties lost to those tax sales." **Herder Spring**, **supra** at n.15 (quoting **Oz Gas** at 279). Our High Court agreed that these consequences favor a prospective application of **IOGA**.

We reach the same result when we analyze the **Chevron Oil** factors on the facts herein. It is beyond cavil that **IOGA** established a new principle of law as it decided an issue of first impression that was not foreshadowed. In **IOGA**, our High Court held there is no statutory authority for the taxation of oil and gas beneath the surface. However, at the time of the tax sale herein, the prevailing law in this Commonwealth was that oil, gas, and coal

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

(1)  whether the decision established a new principle of law;

(2)  a balancing of the merits by looking at the history of the rule in question, its purpose and effect, and whether retroactive application will further or retard its operation; and

(3) an evaluation of the equities involved.

**Oz Gas v. Warren Area School District**, 938 A.2d 274, 276 (Pa. 2007).

underlying unseated lands were minerals, that they constituted real estate, and were subject to taxation as real estate. **F.H. Rockwell & Co.**, **supra** (recognizing oil, gas and coal are minerals, and holding "If oil, gas, and minerals are reserved from the grant of the surface of several tracts of unseated land[,] . . . they can be taxed as" an estate in land.). The Court in **Rockwell** reasoned that "tax is assessed upon the property" and "property could consist of the entire tract, or of the surface, or of the minerals," depending on whether there had been a severance. **Id**. at 666. "The right to sever being established, the power to tax the severed estate necessarily attaches." **Id**. Thus, **IOGA** was a clear departure from prior law.

Secondly, we fail to see how retroactive application of **IOGA** would further its operation on the facts herein. Although the decision determined that there was no statutory authority for imposing taxes on oil and gas that had not been removed from the subsurface, the fact remains that taxes had been assessed and interests conveyed for their non-payment for almost a century pursuant to what was then the law.

Third, the relevant equities weigh heavily in favor of prospective application because, as the **Oz Gas** Court noted, prior to **IOGA**, municipalities, courts, and the legislature reasonably believed oil and gas interests were subject to taxation. Similarly, tax sale purchasers reasonably believed that assessments of mineral rights included oil and gas interests. **IOGA** was based on statutory interpretation, not constitutional rights. While

in the instant case, retroactive application of **IOGA** might not have any negative effect on the public till, it would wreak havoc on almost one hundred years of property conveyances in this Commonwealth, a consequence the **Herder Spring** Court found weighed heavily in favor of prospective application only. We find no error in the trial court's holding that **IOGA** does not apply retroactively to invalidate the 1932 tax sale on this basis.

Trustees also challenge the validity of the 1932 tax sale based on notice that they maintain was both constitutionally deficient and statutorily defective. They contend first that notice by publication alone does not satisfy the mandates of due process, and hence, such notice of the 1932 tax sale was so constitutionally deficient as to render the sale void. **Mullane v. Central Hanover Bank & Trust Co.**, 339 U.S. 306, 314 (1950). They allege that since the assessments reference "Thomas E. Proctor & Heirs" as the mineral rights owners, the officials in Lycoming County knew the heirs had an interest in the property and could have provided notice to the Proctor heirs with reasonable effort.

We find no merit in this claim. Our High Court in **Herder Spring**, **supra** at 378, noted that constructive notice through publication was sanctioned for *in rem* actions in 1935, and the Court declined to "upset that conclusion based on preconceived notions of what is reasonable in the age of the Internet." In so holding, the Court relied upon **City of Philadelphia v.**

*Miller*, 49 Pa. 440 (Pa. 1865), for the proposition that notice by publication was sufficient to satisfy due process requirements for tax sales of unseated land pursuant to the Act of 1815, given the difficulties of ascertaining the owner of unseated land and the protection afforded by the two-year redemption period. The Court held therein that even if the owner "received no notice of sale, it required of him no great measure of diligence to look after his interests within two years." *City of Philadelphia*, *supra* at 451.

Second, Trustees argue that the notice did not comply with the statutory requirements, and hence, the sale did not divest their interest in oil and gas. Trustees point to the statutory mandate that notice be published no later than sixty days prior to the tax sale, and evidence that that the earliest notice was not published until May 26, 1932, only eighteen days before the June 13, 1932 sale. Cornwall contends that only three weeks' notice was required under the applicable statute, to which Trustees counter that the earliest notice was given less than three weeks before the sale. The trial court initially discounted this dispute in granting judgment on the pleadings, finding no proof of a lack of notice. Upon reconsideration, the court reversed itself, conceding that, in requiring proof, it had failed to apply the proper standard for entry of judgment on the pleadings.

We agree with the trial court that there is a factual dispute as to whether the notice complied with the applicable statute. However, that factual issue is of no consequence as the law in effect at the time, the Act of

March 9, 1847, P.L. 278, as amended by the Act of March 26, 1925, provided that the failure to advertise the sale of unseated land did not invalidate a tax sale. **See also Laird v Hiester**, 24 Pa. 452 (Pa. 1855). Thus, this alleged deficiency offers no basis for relief.

Similarly, Trustees allege that the assessments were invalid as there were irregularities in the process. Trustees point to the fact that the 1930 assessment was generated outside the statutorily-mandated triennial assessment cycle.[15] Although such a variation is permitted if mineral interests were developed from the property during that year, they direct our attention to Cornwall's concession that no oil and gas was produced on the property that year.[16] Additionally, Trustees contend that the assessments of the mineral estates improperly mirrored the Cornwall Mountain Club's ownership of the surface parcels.

Cornwall counters that **Herder Spring** barred challenges to tax sales based upon irregularities in the number of acres in the various warrants and violations of the triennial assessment rules under the two-year redemption period of the 1815 Act or the statute of limitations. Trustees argue that

---

[15] We note that the 1931 assessment that served as the basis for the 1932 tax sale complied with the triennial assessment cycle.

[16] The record is silent, however, as to whether there was production of coal or other minerals from that property that year that may have prompted the assessment.

*Herder Spring* did not address invalid tax assessments such as the 1930 assessment herein, which were conducted outside the triennial assessment cycle. Trustees challenge Cornwall for maintaining that the statutory scheme satisfies due process and, at the same time, asserting that compliance with those provisions is but a mere formality.

The law recognizes a presumption of the regularity of the acts of public officers. *Curtis Bldg. Co. v. Tunstall*, 343 A.2d 389, 390 (Pa.Cmwlth 1975). Nonetheless, that presumption is rebuttable. Although the pleadings raise disputed issues of fact regarding irregularities in the assessment process, the critical question is whether such irregularities in the assessment would, as a matter of law, render the tax sale void and legally insufficient to convey title to the oil and gas. If the answer is in the affirmative, judgment on the pleadings would not be proper. If such irregularities only rendered the sale voidable within the period for challenging the tax sale, a time that has long since expired, they would not provide a basis to deny judgment on the pleadings. *See Ryan v. Bruhin*, 88 Pa. Super. 61, 67 (Pa.Super. 1926) ("The Act of March 13, 1815 (sec. 4) is explicit in providing that 'no alleged irregularity in the assessment, or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal.'").

In granting partial judgment on the pleadings, the trial court relied upon *Poffenberger v. Goldstein*, 776 A.2d 1037 (Pa.Cmwlth. 2014), for

the proposition that a six-year statute of limitations barred Trustees from collaterally attacking the validity of the 1932 tax sale. Trustees argue that the court's reliance is misplaced as it was in *dicta* only that the **Poffenberger** court noted that challenges based on "the procedural irregularity" of a tax sale, including deficiencies in notice, were barred by the statute of limitations. In support thereof, Trustees point out that, in **Poffenberger**, the Court ultimately entertained the challenge to the validity of the 1985 tax sale despite the fact that the six-year statute of limitations should have barred the action.[17]

This is an action to quiet title, not an action to upset a tax sale. The purpose of a quiet title action is to settle competing claims to interests in property or to determine right or title or the validity of any deed affecting any interest in land. Quiet title actions can be used to determine the respective interests of different parties claiming an interest in oil and gas rights, and these actions have become more common in this Commonwealth as landowners seek to enter into gas leases. Title searches incident to such leases may reveal competing claims to the gas rights or royalties.

---

[17] The **Poffenberger** Court held that the six-year statute of limitations applicable to an action to set aside a tax sale in 1985 governed the sale that took place that year. Similarly, it concluded that the statute of limitations in 1964 governed the 1964 tax sale, and regardless of its duration, it had expired by 1997. In this case, the tax sale took place in 1932, and we believe the statute of limitations then applicable governs herein and has certainly expired.

A quiet title action is the appropriate forum for testing the validity of titles obtained at tax sales. **Price-Jeffries Co. v. Tillman**, 312 A. 2d 494 (Pa.Cmwlth. 1973). Former owners may use a quiet title action to attack defects in tax sales that would invalidate the deed by which they lost title, and purchasers at tax sales can file such an action to clear or confirm the deed by which they obtained title. Pa.R.C.P 1061(b)(4). Despite a presumption of good title in the possessor of a tax deed, the presumption falls when the regularity of the deed is questioned. **See Curtis Building Co. v. Tunstall**, 343 A. 2d 389 (Pa.Cmwlth. 1975).

We agree with the trial court that Trustees are time-barred from challenging procedural irregularities in the notice, assessment, and tax sale process. Those procedural irregularities, had they been timely challenged after the tax sale, may have been sufficient to upset the sale. Trustees are correct, however, that statutes of limitation and repose do not preclude one from defending a quiet title action on the basis that a tax sale was void, *i.e.*, where there were jurisdictional defects. The propriety of judgment on the pleadings herein turns on whether the Trustees pled any basis for finding the 1932 tax sale void.

In **Trexler v. Africa**, 33 Pa.Super. 395, 410 (1907), this Court relied upon the Supreme Court's decision in **McReynolds et al. v. Longenberger**, 57 Pa. 13, 27 (1868), in identifying the requisites to a valid tax sale. Our High Court concluded therein that "the authority of the treasurer to sell

unseated lands for taxes depends upon facts; viz., that the land was unseated at the time of the assessment; that a tax appears to have been, and was in fact assessed upon it by the proper assessing officers, and that the tax had been due for one whole year, and remains unpaid." If these facts were not established, this Court held in *Trexler* that the tax sale was void and the five-year time limitation of the Act of 1804 on an action to recover land sold at tax sale did not apply. We reasoned that, "the five years' limitation will not breathe life into a void tax title." *Id*. at 410.

The following cases illustrate what facts will render a tax sale void. Tax sales have been voided where seated property was improperly treated as unseated as in *Weaver v. Meadville Lumber Mfg. Co.*, 61 Pa. Super. 167 (Pa.Super. 1915); where unseated property was not correctly identified as in *City of Philadelphia v. Miller*, *supra* (tax sale void where land was assessed to "John Turnbull" instead of warrantor "James Tremble"); where the taxes were paid as in *Albert v. Lehigh Coal & Nav. Co.*, 246 A.2d 840 (Pa. 1968) (1870 and 1878 tax sales of unseated land held to be void as the taxes had been paid and credited to the wrong tract of land); or where the deed was forged as in *Reck v. Clapp*, 98 Pa. 581 (Pa. 1881) (a forged deed conveys no title); or where the treasurer lacked the authority to conduct the sale at the time, as in *Brown v. Day*, 78 Pa. 129 (Pa. 1875) (tax sale void where treasurer mistakenly credited tax payment to wrong property).

Trustees raise none of those allegations herein. Furthermore, all the requirements for a valid sale set forth in *Trexler* were satisfied in this case.

We acknowledge that the Trustees pled that the tax deeds were the product of fraud and/or want of authority by the treasurer, who was subsequently convicted of embezzlement, forgery and falsification of records. Margaret O.F. Proctor Trust's Answer, New Matter, and Counterclaims to Cornwall Mountain Investments, L.P.'s Amended Complaint in Action to Quiet Title, 6/18/14, at ¶61. However, this averment lacks the requisite particularity to set forth a claim for fraud. *See* Pa.R.C.P. 1019. Moreover, no reasonable inference can be drawn from this allegation that the treasurer forged or falsified the records herein.

Additionally, Trustees argue that the manner and timing of the assessment of the mineral rights corresponding to the surface estate of the Cornwall Mountain Club, and only those mineral rights, were instigated by Cornwall in order to precipitate a tax sale, the purpose of which was to permit Cornwall to gain title to the severed subsurface rights. That may be true, however, an improper motive is not a reason to void the sale.

We conclude that the pleadings and the documents appended thereto do not set forth a basis to invalidate the tax sale. Either the Proctor heirs or the surface owners were obligated under the 1806 statute to notify the taxing authority of their severed property interests so that they could be separately assessed. In fact, notice was given and a separate assessment of

the mineral rights and the surface estate was conducted. The taxes assessed to the minerals in the name of Thomas E. Proctor Heirs were overdue and unpaid for more than a year.[18] A tax sale was conducted on June 13, 1932, after advertisement in local newspapers. Cornwall Mountain Club acquired the mineral rights in the Property by submitting the highest bid at the tax sale. The tax sale deed issued, was delivered to the purchaser, and subsequently filed of record. It served as official notice of the conveyance of the mineral rights estate to Cornwall Mountain Club. The Trustees have not alleged any defect in the tax sale deed. Their forbearers did not seek to upset the tax sale or redeem the Property's mineral rights within the allotted time. Moreover, there is no indication that either the Trustees herein, the trustees of the Proctor Heirs Trust, or any heir of Thomas Proctor paid taxes on Proctor's reserved interest in the Property before or after 1930.

In short, the motivation for the assessment and tax sale of the mineral rights beneath the Property is not relevant because assessment of the Proctor heirs' mineral estate was statutorily authorized, it was conducted by the person charged with that duty, and when the taxes were not paid, sale of the mineral rights at tax sale was proper.

_____

[18] The trial court found that the "pd." notation on the tax record reflected Cornwall's payment of the taxes, not a payment by Trustees' forbearers as Trustees posited, a finding that was not challenged on appeal.

- 30 -

For all of the foregoing reasons, we conclude that the tax sale of minerals encompassed the Trustees' oil and gas interests, the assessment of those interests was authorized, the Trustees' challenge to the tax sale based on alleged procedural irregularities in the assessment and notice is time-barred, and the pleadings do not assert any basis upon which to void the 1932 tax sale. Hence, judgment on the pleadings in favor of Cornwall was properly entered.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/21/2016