J-A20020-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KETA GAS & OIL COMPANY, A PENNSYLVANIA CORPORATION, FORMERLY KETA REALTY COMPANY | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : : | |
| THOMAS E. PROCTOR, JAMES H. PROCTOR, THOMAS E. PROCTOR, JR., ANNE PROCTOR RICE, EMILY PROCTOR MANDELL, LYDIA W. THACHER, AUGUSTA PROCTOR, ELLEN O. PROCTOR, SARAH JOSLIN, ABEL H. PROCTOR AND MASSACHUSETTS GENERAL HOSPITAL, HEIRS LEGATEES AND DEVISEES UNDER THE WILL OF THOMAS E. PROCTOR, AND ALL PERSONS CLAIMING UNDER OR THROUGH THE ABOVE, AND BRINKER HUNTING CLUB, A NON-PROFIT CORPORATION | : : : : : : : : : : : : : : : : : : : : | No. 1975 MDA 2018 |
| v. | : : : : : | |
| ANADARKO E&P ONSHORE, LLC, SOUTHWESTERN ENERGY PRODUCTION COMPANY, AND INTERNATIONAL DEVELOPMENT CORPORATION | : : : : : : : : | |
| APPEAL OF: TRUSTEES OF THE THOMAS E. PROCTOR HEIRS TRUST AND TRUSTEES OF THE MARGARET O.F. PROCTOR TRUST | : : : : : | |

Appeal from the Order Entered October 23, 2018

In the Court of Common Pleas of Lycoming County Civil Division at No(s): CV-1950-000571-QT

BEFORE: GANTMAN, P.J.E., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:              **FILED DECEMBER 06, 2019**

Appellants, Trustees of the Thomas E. Proctor Trust and Trustees of the Margaret O.F. Proctor Trust ("Proctor") appeal the trial court's order granting the motions for summary judgment filed by Southwestern Energy Production Company ("SWN"), International Development Corporation ("IDC"), and Anadarko E & P Onshore LLC ("Anadarko") (collectively "Appellees"). We affirm.

While the factual and procedural history of this case is extensive, we instantly provide the following relevant summary as gleaned from the trial court's opinion and the certified record. In 1894, the Proctor family owned the surface and subsurface rights to vast amounts of unseated lands in Pennsylvania including the parcels identified as James Strawbridge Warrant 5665 ("W5665"), approximately 948 acres and James Strawbridge Warrant 5667 ("W5667"), approximately 1096 acres (collectively referred to as "the Warrants") .

In 1894, Thomas Proctor and his wife conveyed their surface rights to the Warrants to Elk Tanning Company ("Elk") but reserved the subsurface rights for themselves. In 1903, Elk conveyed the surface rights to the Warrants to Central PA Lumber Company ("CPLC"). In 1908, Calvin H. McCauley, Jr. purchased the Warrants at a tax sale ("1908 tax sale"), only to

- 2 -

turn around and sell both parcels back to CPLC in 1910. In 1913, CPLC conveyed its surface interest in W5667 to Four Mile Fish and Game Club ("Four Mile deed") but purported to reserve the subsurface rights to Proctor. In 1921, CPLC conveyed its surface interest in W5665 to Lincoln Hunting and Fishing club but also purported to reserve the subsurface rights to Proctor ("Lincoln deed"). For purposes of the instant case, the specific language at issue in the Four Mile and Lincoln deeds is as follows:

> EXCEPTING and RESERVING, NEVERTHELESS, unto Thomas E. Proctor his heirs and assigns, All the natural gas, coal, coal oil, petroleum, marble and all minerals of every kind and character, in, upon or under the said lands hereinbefore mentioned and described, and every part thereof or which may at any time hereinafter be discovered … The above-mentioned minerals and mineral rights to be excepted and reserved as fully as said minerals and mineral rights were excepted and reserved in deed from Thomas E. Proctor and wife above recited.

In 1942, CPLC purported to convey the subsurface rights to the Warrants, along with other parcels, by quitclaim deed, to Keystone Tanning & Glue Company, who thereafter conveyed the same rights to Keta Realty Company ("Keta"), in 1950. Lincoln conveyed its surface rights to W5665 to Brinker Hunting Club ("Brinker") in 1948.

In 1950, Keta filed a complaint to quiet title to the subsurface rights to the Warrants. In the 1950 complaint, Keta recited the chain of title to the Warrants, complete with references to the relevant deeds. Proctor and Brinker were among the named defendants to the complaint. The sheriff properly served Brinker with the complaint, but Proctor was served via publication

because Keta claimed to be unable to identify or locate the Proctor heirs. In any event, neither Proctor nor Brinker responded, and in March 1951 the court entered a default judgment ("1951 Default Judgment") declaring, *inter alia*, Keta the owner of all subsurface rights to the Warrants. Successors in interest to Keta include Appellees. Trout Run Hunting and Fishing Club is the successor in interest to Brinker.

After the 1951 Default Judgment, the next judicial activity in this case occurred in 2014 and 2015 when Proctor's various heirs filed petitions to strike/open the 1951 Default Judgment. The trial court denied Proctor's petition to strike, finding that Keta's 1950 complaint to quiet title was not deficient in regard to its description of the land and chain of title and that a defect did not appear on the face of the record. However, the trial court did issue an order to open the 1951 Default Judgment in 2015, finding that Keta had engaged in fraud in 1950 in order to obtain the judgment by claiming to be unaware of the Proctor heirs' whereabouts. In essence, the court credited the allegation that Keta engaged in unsuccessful negotiations with Proctor to extinguish Proctor's reserved subsurface rights and thereafter filed the quiet title complaint regarding the same rights.

After the trial court opened the 1951 Default Judgment in 2015, Appellees filed the instant motions for summary judgment averring that the 1951 Default Judgment should remain in place, while Proctor filed a response, raising a New Matter, seeking to reverse the 1951 Default Judgment. Finding that the 1908 tax sale extinguished Proctor's subsurface rights, the trial court,

- 4 -

via the October 23, 2018 order, granted summary judgment in favor of

Appellees, thereby affirming the 1951 Default Judgment.[1]

Proctor filed the instant timely appeal and raised the following issues for

our review:

1. Did the Court err in striking [Proctor's] additional facts and evidence, when Pennsylvania Civil Rule 1035.3(b) expressly provides that the non-moving party "may supplement the record" in responding to summary judgment?

2. Did the Court err in granting summary judgment, when the evidence showed that the property at issue was in fact "seated," rendering an "unseated land" tax sale void?

3. Did the Court err in granting summary judgment, when the evidence showed that previously-severed subsurface interests were reported to county commissioners pursuant to the Act of March 28, 1806, P.L. 644, such that a tax sale would not convey the subsurface?

4. Did the Court err in granting summary judgment, when the evidence showed that the purported tax sale purchaser was an agent of the defaulting taxpayer, rendering the "purchase" a *de facto* redemption that restored the *status quo ante*?

5. Did the Court err in granting summary judgment, because appellees are bound by express reservations of subsurface rights in the deeds through which they claim title?

6. If the defaulting taxpayer failed to accurately report its interest in the property at issue for taxation, or pay taxes when due, do these

_____

[1] We note that after the trial court opened the 1951 Default Judgment in 2015, Trout Run filed a separate motion to strike the judgment in 2018. After hearing argument on the matter, the trial court dismissed Trout Run's motion in the October 23, 2018 order and memorandum opinion here at issue. Trout Run has also filed an appeal from the trial court's October 23, 2018 order, which is currently before this Court, listed under 1939 MDA 2018.

failures estop it and its successors from benefiting from these defaults?

7. Where the identities and whereabouts of property owners were known to taxing authorities, did an ensuing tax sale undertaken with no effort at individual notice violate the owners' Constitutional due process rights?

Proctor's Br. at 3-4.

In their first issue, Proctor contends that the trial court erred by refusing to consider the information Proctor provided via its filing entitled "new matter," filed in response to Appellees' motions for summary judgment. Proctor contends that the title "new matter" was "inconsequential" and instead the trial court should have considered this filing as Proctor's effort to supplement the record, as permitted under Pennsylvania Rule of Civil Procedure 1035.3(b). As such, Proctor argues that the trial court committed "reversible error" by electing to not consider the filing. We conclude that Proctor's argument is unavailing.

Pa.R.Civ.P. 1030(a) provides that litigants may present certain affirmative defenses via a responsive pleading under the heading "New Matter." Whereas Pa.R.Civ.P. 1035.3(b) provides litigants with the opportunity to oppose a motion by supplementing the record. Here, the trial court aptly noted that Proctor's filing, entitled "New Matter," filed in response to Appellees' summary judgment motions, was not in accordance with the appropriate Pennsylvania Rule of Civil Procedure. Nevertheless, the trial court proceeded to consider the material Proctor presented under New Matter. Accordingly, even if the trial court should have considered Proctor's filing as a

supplement to the record pursuant to Pa.R.Civ.P. 1035.3(b), regardless of the filling's nomenclature, the trial court did incorporate Proctor's supplemental filing into its review and decision. Therefore, Proctor's claim that the trial court failed to properly consider their filing pursuant to Pa.R.Civ.P, 1035.3(b) is of no moment.

In its next four issues, Proctor's overarching contention is that the trial court erred by granting summary judgment in favor of Appellees because genuine issues of material fact remained outstanding regarding the 1908 tax sale, which the trial court found divested Proctor of its subsurface rights in the Warrants. The entry of summary judgment is appropriate "where the record demonstrates that there remain no genuine issues of material fact, and . . . the moving party is entitled to judgment as a matter of law." *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1182 (Pa. 2010). As review of summary judgment presents a question of law, our standard of review is *de novo* and our scope of review is plenary. *Id.*

The seminal case in regards to the 1908 tax sale is *Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016). There, the Pennsylvania Supreme Court provided comprehensive guidance regarding the sale of unseated lands for unpaid taxes, subject to the Act of 1815, where a subsurface estate was not duly reported to the county commissioners prior to the sale. In such case, our Supreme Court held that a tax sale effectuates a sale of the property in its entirety, regardless of any prior severance, if taxes are unpaid on both surface and subsurface estates. *Id.* at 374-75. Thus, the

purchaser in such a tax sale would obtain perfect title and become "the first link in a new chain of title." *Id.* at 379. Further, where the owner of the property sold at a tax sale does not challenge the assessment or sale within the two-year redemptive period provided by the Act of 1815, § 4 as set forth at 72 P.S. § 6091, any subsequent challenge may not be heard. *Id.* at 374-75.

Here, in its second issue, Proctor seeks to invalidate the 1908 tax sale by averring that the Warrants were "seated" and therefore were improperly sold at a tax sale for "unseated" property. To this end, Proctor cites historical CPLC documents that purportedly establish that CPLC harvested tanbark and lumber from the Warrants from 1903 through 1909. Therefore, according to Proctor, this Court should deem the 1908 tax sale void. In support of this proposition, Proctor points to, *inter alia*, **Cornwall Mountain Investments, L.P. v. Thomas E. Proctor**, 158 A.3d 148, 160 (Pa.Super. 2017) (holding "Tax sales have been voided where seated property was improperly treated as unseated...").

In **Herder Spring**, the Pennsylvania Supreme Court discussed the distinction between seated vs unseated lands:

> Prior to 1947, Pennsylvania's land was categorized as either seated or unseated land. Seated land was property that had been developed with residential structures, had personal property upon it that could be levied upon for the tax due, or was producing regular profit through cultivation, lumbering, or mining. Unseated land is best understood as "wild" land but included any land that did not meet the requirements of being seated. The determination of whether land was seated or unseated was entirely based upon the

> eye of the assessor who would transverse the county determining whether land was being developed and then "return" the land to the county commissioners to assess the property for taxation.
>
> ***
>
> If the assessor determined that the land was seated, the land was taxed to the land owner, who was personally responsible for the payment of the taxes which could be collected against his or her property. The owner of unseated land, however, was not responsible for the payment of taxes, which were instead imposed on the land itself, in the name of the person to whom the original warrant had been issued. The current owner's name would be used only for purposes of description.

*Herder Spring* at 363-64.

Further, given the difficulty that assessors faced in determining whether vast tracts of land where "seated" or "unseated" and the ownership thereof, it is unsurprising that where the assessment procedure was regular, an ensuing tax sale was deemed valid "irrespective of whether the assessor, in determining the status of the property made a mistake or not." *Scott v. Bell*, 25 A.2d 308, 309 (Pa. 1942). Thus, purchasers at tax sales were afforded protection because sales which followed the proper assessment procedure were insulated from litigation regardless of "whether the assessor had erred in determining whether the land was in fact seated or unseated, a question which was often close and technical." *Id.*

In the instant case, the Warrants were assessed as unseated. Given the difficulty assessors faced in classifying huge acreage of often "wild" lands, it

is certainly not unreasonable that assessors could have come to this conclusion even if tanbark and timber were being mined on some portion of the Warrants during the time in question. *See Herder Spring*, 143 A.3d at 363-64. Hence, the 1908 tax sale was not susceptible to invalidation on the basis of being classified as "unseated," regardless of any factual error by the assessors. *See Scott*, 25 A.2d at 309.

Proctor is correct in that Pennsylvania courts have deemed tax sales void where land that had been properly assessed as "seated" was mistakenly sold as "unseated." *See Cornwall*, 158 A.3d at 160. This is not the case here. The Warrants were assessed as "unseated" and sold as such at the 1908 tax sale. Therefore, any mistake of fact regarding the "unseated" nature of the Warrants made by assessors prior to the 1908 sale is inapposite because the tax sale was properly conducted pursuant to the Warrants "unseated" classification. *See Scott*, 25 A.2d at 309. Thus, the trial court did not err by determining that Proctor's contention regarding the alleged mining of tanbark and timber from the Warrants did not present an outstanding issue of material fact precluding summary judgment. Hence, Proctor's second issue merits no relief.

Turning to their third issue, Proctor claims that an outstanding issue of material fact remains regarding whether Proctor's reservation of the subsurface rights to the Warrants had been properly reported to the Lycoming County Commissioners prior to the 1908 tax sale. In support of this contention, Proctor points to testimony, presented over a century ago, in the

case of ***Gamble v. Central Pennsylvania Lumber Company***, 74 A. 69 (Pa. 1909). Proctor avers that in ***Gamble***, Proctor's former attorney B.S. Bentley and Elk's former tax agent S.A. Rote, testified regarding their general practice of ensuring taxes were paid on Proctor/Elk properties in Lycoming County. Thus, according to Proctor, one can infer that the taxes at issue on the Warrants were properly paid. In addition, Proctor points to various township records and Lycoming County records that they contend indicate that their subsurface rights to the Warrants were properly recorded because records regarding neighboring warrants, which were also subject to the 1908 tax sale, properly memorialized Proctor's subsurface rights. Proctor maintains that the trial court erred by failing to find that an outstanding issue of material fact remained as to whether Proctor's subsurface reservations in the Warrants had been reported to the Lycoming County Commissioners prior to the 1908 tax sale. Declining to speculate based on the evidence presented, we cannot agree.

Although Proctor presents no direct evidence that its interests in the Warrants were duly reported to the Lycoming County Commissioner's prior to the 1908 tax sale, it contends that this Court is "required" to come to that conclusion by viewing the evidence in the light most favorable to the nonmoving party, Proctor. ***See Chepkevich***, 2 A.3d at 1182. While Proctor is correct that all proper inferences must be weighed in favor of the nonmoving party in the context of a summary judgment analysis, this Court must not make the leap to speculation:

We are also mindful that the evidence relied upon by the non-moving party need not be direct evidence, but may be circumstantial evidence and the inferences reasonably deducible therefrom. Nevertheless, such circumstantial evidence and its reasonable inferences must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith. It is also well-settled that a court reviewing the propriety of a summary judgment motion must be mindful that a jury may not be permitted to reach its verdict on the basis of speculation or conjecture.

*InfoSAGE, Inc. v. Mellon Ventures, L.P.*, 896 A.2d 616, 626 (Pa. Super. 2006) (citations and internal quotation marks omitted).

Here, the trial court determined that the voluminous documentary evidence provided by Proctor did not establish, even by inference, that Proctor's purported reservation of subsurface rights in the Warrants was reported to the Lycoming County Commissioners prior to the 1908 tax sale. Accordingly, the trial court found, pursuant to **Herder Spring**, that the 1908 tax sale effectively divested Proctor from his subsurface reservations in the Warrants. **See Herder Spring**, 143 A.3d at 370. We concur with the trial court because we conclude that Proctor has not presented evidence that establishes a genuine issue of material fact regarding its contention that the Warrants were duly reported to the Lycoming County Commissioners without requiring this Court to engage in impermissible speculation or conjecture. **See InfoSAGE**, 896 A.2d at 626. Therefore, Proctor's third issue must also fail.

In issue four, Proctor argues that the trial court erred by failing to find that genuine issues of material fact, regarding whether Calvin McCauley was

acting as an Agent for CPLC at the time of the 1908 tax sale, precluded summary judgment. Proctor specifically argues that documentary evidence from the approximate time period of the 1908 tax sale shows that McCauley served as both an officer and attorney for CPLC. Therefore, according to Proctor, McCauley's purchase of the Warrants at the 1908 tax sale merely constituted a redemption of the property on behalf of CPLC thereby restoring title to the Warrants to the "status quo" which would include Proctor's reservation of subsurface rights. *See Yocum v. Zahner*, 29 A. 778, 779 (Pa. 1894) (holding that redemption left "the title precisely as though the sale had not been made.") Thus, Proctor avers that its reservation of subsurface rights to the Warrants should have survived the 1908 tax sale. Further, Proctor emphasizes that the trial court erred by failing to find the 1908 tax sale void because CPLC should have been precluded from obtaining superior title by failing to pay taxes. In support of this proposition, Proctor cites *Powell v. Lantzy*, 34 A. 450, 451 (Pa. 1896) (holding one cannot obtain better title via purchase at a tax sale caused by failure to pay taxes one was legally or morally obligated to pay). However, we find Proctor's agency argument unavailing.

First, Proctor fails to explain how CPLC or McCauley was under any duty, legal or otherwise, to pay taxes on Proctor's subsurface estate. For example in the *Powell* case, cited by Proctor, the Court qualified its holding by clarifying that the rule prohibiting one from profiting from his own failure to pay taxes was "restricted to cases where it was the duty of the purchaser to pay the tax." *Id.* at 451. Here it was Proctor, not CPLC or its successors in

interest, who failed to pay taxes on Proctor's subsurface estate, causing that estate to be subject to a tax sale. Likewise, Proctor fails to establish that McCauley was acting at the behest of CPLC when he purchased the Warrants at the 1908 tax sale. To so conclude, would require this Court to improperly speculate as to the motives of individuals acting over a century ago. **See InfoSAGE**, 896 A.2d at 626.

Further, our recent jurisprudence has established that McCauley's motives in 1908 are not instantly dispositive. In **Herder Spring**, our Supreme Court held that parties to a tax sale, held pursuant to the Act of 1815, had two years to challenge any irregularities regarding such sale and/or redeem the property at issue. **Herder Spring**, 143 A.3d at 374-75. As our Supreme Court explained, this two-year statutory period provided owners of unseated property the opportunity to redeem or challenge tax sales, while allowing tax sale purchasers security after the two year period had run. **Id.** at 379. Here, Proctor failed to challenge any alleged irregularity in the 1908 tax sale, regarding McCauley's alleged fiduciary status or otherwise, during the two-year statutory period and is estopped from doing so now, over a century later.

Moreover, in **Cornwall**, this Court emphasized that a challenge to a tax sale post the two-year statutory period provided under the Act of 1815, is untenable as long as the property was unseated at the time of its assessment, the tax at issue was assessed by the proper authorities, and the tax went unpaid for over a year. **Cornwall**, 158 A.3d at 162. Indeed, in **Cornwall**, the appellants claimed that the tax sale there at issue was instigated solely for

the purpose of allowing an owner of surface rights to also gain ownership of originally severed subsurface rights. *Id.* at 161. Our Court there held that the motives of the tax sale purchaser were not relevant where the sale was statutorily authorized. *Id.* at 161-62. Likewise, here the 1908 tax sale was statutorily authorized, conducted by the proper authorities, and held in response to unpaid taxes. Therefore, McCauley's motives, even if improper, are not a sufficient reason to void the sale. *See Id*. Thus, Proctor's fourth issue also lacks merit.

Proctor, in their fifth issue, argues that the trial court erroneously granted summary judgment in this case because the deeds from which Appellees' predecessors in interest derived title, specifically the Four Mile deed and the Lincoln deed, contained language referencing Proctor's subsurface rights. To this end Proctor cites the well settled legal principal that "one claiming under a deed is bound by any recognition it contains of title in another." *Elliott v. Moffett*, 74 A.2d 164, 167 (Pa. 1950). However, we find Proctor's argument unavailing pursuant to the seminal *Herder Spring*.

As our Supreme Court emphasized in *Herder Spring*, a "purchaser at a tax sale becomes the first link in a new chain of title and he need not prove the title back of the same." *Id.* at 379 (citation omitted). Therefore, once the tax sale of unseated lands was effectuated, pursuant to the Act of 1815, the new purchaser, and successors in interest, obtained perfect title regardless of any deed language reserving subsurface rights to another. *Id.* Proctor attempts to distinguish *Herder Spring* by noting that, in that case, the

subject reservation language did not mention the name of the purported owner but instead merely contained a generic reservation of subsurface rights. However, the fact that Proctor was specified by name in the deed language at issue here does not dilute the underlying factual predicate: Proctor's subsurface rights were extinguished by the 1908 tax sale. Thus, neither statutory nor case law allow for the preservation of Proctor's extinguished reservation via subsequent deed language. *See id.* Accordingly, we conclude that the deed language at issue from the Four Mile and Lincoln deeds did not preserve Proctor's subsurface rights in the Warrants after they had been extinguished by the 1908 tax sale. Thus Proctor's fifth issue is also devoid of merit.

In issue six, Proctor once again argues that the trial court erred by failing to consider the 1908 tax sale void due to CPLC's own failure to pay taxes on the Warrants and inferred improper motives regarding such failure. Once again, Proctor cites *Powell* for the proposition that a purchaser cannot obtain a superior title based on his "own neglect of duty." *Powell*, 34 A. at 451. However, as we noted in our discussion of Proctor's fourth issue above, *Powell* is distinguishable because unlike in that case, our instant purchaser McCauley was under no obligation to pay taxes on behalf of Proctor's subsurface estate, nor was the debtor CPLC responsible for Proctor's taxes. Moreover, this Court has held that even if a purchaser's motive at a tax sale is improper, such motive is not sufficient to set aside an otherwise statutorily authorized sale. *See Cornwell*, 158 A.3d at 161. Instantly, the 1908 tax sale

was statutorily authorized and therefore any alleged improper motives on the part of purchaser McCauley in 1908 did not require the trial court to deem that sale void. Thus, Proctor's sixth issue also fails.

In their last issue, Proctor sets forth a brief argument that the trial court should have invalidated the 1908 tax sale because Proctor's due process rights were violated when they only received notice of the sale by publication when there was allegedly reason to believe that Proctor's representatives were well-known to Lycoming County tax officials. However, as acknowledged by Proctor, our Supreme Court rejected a similar argument in **Herder Spring**, instead holding that notice by publication in a 1936 tax sale, subject to the Act of 1815, afforded due process to the parties of the sale. **Herder Spring**, 143 A.3d at 376-377. While acknowledging this holding, Proctor attempts to distinguish **Herder Spring** by contending that, in that case, the record did not contain any evidence regarding what steps might have been involved in ascertaining the owners of the unseated property to provided personal notice. However, this argument is inapposite here because Proctor also does not present any factual support regarding the supposed ease of locating Proctor's heirs in regards to the 1908 tax sale that does not require this Court to engage in impermissible speculation or conjecture. **See InfoSAGE**, 896 A.2d at 626. Moreover, Proctor fails to elucidate as to why, even if such evidence were available, it would negate the holding in **Herder Spring** which established that notice by publication does not violate an owner's due process rights in

- 17 -

the instant circumstance. Therefore, we conclude that Proctor's seventh issue also merits no relief.

Accordingly, because we conclude that the trial court properly determined that the 1908 tax sale extinguished the subsurface rights of Proctor and Proctor has raised no outstanding issues of material fact regarding the same, we hold that the trial court properly granted Appellees' respective motions for summary judgment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/06/2019